PATRICIA HARDY *v.* JOHN GRIFFIN ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 8903-3097
NEW HAVEN

Memorandum filed October 4, 1989

*Jerome Frank Legal Services Clinic at Yale University,* for the plaintiff.

*La Sala, Walsh & Wicklau,* for the defendants.

DeMayo, J. The plaintiff, Patricia Hardy, brought this action on behalf of her six year old child, Verron Hardy, claiming that he suffered severe and permanent brain damage from his exposure to, and ingestion of, lead-based paint.

From about November 1, 1984, to August 1, 1986, the plaintiff occupied a housing unit at 18 Arthur Street in New Haven. During this time, Verron was found to have abnormally high levels of lead in his blood. The named defendant and the defendant Leona A. Griffin, were the owners of 18 Arthur Street and leased the premises to Patricia Hardy.

In this case of first impression, the plaintiff has claimed damages on a theory of strict liability because of the defendants' alleged violation of both state statutes and a city ordinance. The failure to keep the premises free of lead-based paint is claimed to be the violation and is also the basis for a claim made under the Connecticut Unfair Trade Practices Act (CUTPA).

The defendants have denied any knowledge of the existence of such paint, suggesting that if there were any, it existed prior to their purchase of the property. They further deny the use of any lead-based paint on the premises.

From the evidence the plaintiff presented at trial, the court concludes that Verron suffers from lead paint poisoning and that this condition was a result of his exposure to the lead-based paint present at 18 Arthur Street.

The named defendant admitted that in January, 1987, he received a notice from the city of New Haven advis-

ing him of the presence of lead paint at 18 Arthur Street. On prior occasions, he had been put on notice that repairs to this unit were required. The plaintiff testified that she had seen Verron eating paint chips, which prompted her to have him tested for the presence of lead in his blood. She also stated that the apartment was painted by the defendants but that the previous coat of paint was not scraped. This underlying coat was described as "thick, chipped and peeling."

The named defendant's suggestion that someone "set him up" by spraying on lead paint is entitled to no credence. As for the testimony offered by the defendants that Verron was observed eating paint out of a can, their own evidence as to the dates of the termination of the manufacture and sale of lead-based paint in Connecticut renders this event, even if it is accepted by this court as having occurred, to be of dubious significance.

In support of the strict liability theory, the plaintiff cites General Statutes § 47a-8 and the New Haven Code of General Ordinances. Section 47a-8 provides as follows: "The presence of paint which does not conform to federal standards as required in accordance with the Lead-Based Paint Poisoning Prevention Act, Chapter 63 of the Social Security Act, as amended, or of cracked, chipped, blistered, flaking, loose or peeling paint which constitutes a health hazard on accessible surfaces in any dwelling unit, tenement or any real property intended for human habitation shall be construed to render such dwelling unit, tenement or real property unfit for human habitation and shall constitute a noncompliance with subdivision (2) of subsection (a) of section 47a-7." Section 47a-7 (a) (2) imposes an affirmative duty upon landlords to "make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition . . . ." The New Haven Code of General Ordinances sets a stricter stan-

dard than the federal standards referred to in § 47a-8. New Haven Code of General Ordinances § 16-49 et seq.

The plaintiff cites *Panaroni* v. *Johnson,* 158 Conn. 92, 101, 256 A.2d 246 (1969). In that case, our Supreme Court stated: "The violation of an ordinance enacted for the protection of the public is negligence as a matter of law." *Panaroni* also involved the New Haven housing code, and the court found that the plaintiff there was a member of the class for whose protection the New Haven Code of General Ordinances was enacted. This court similarly concludes that the plaintiff in the present case is a member of the class for whose protection the provision of the housing code referred to above was enacted.

The defendants' breach, therefore, of the duty imposed by the New Haven Code of General Ordinances to maintain rental premises free of lead paint (or not to rent premises containing lead paint) renders them liable for the injuries incurred by Verron. On the facts here, the court further finds that the defendants are liable for Verron's condition by virtue of their negligent failure to keep the premises free of lead paint and because they rented the premises when they should have known of the presence of lead paint.

An examination of lead paint poisoning cases in other jurisdictions leads this court to the conclusion that the decision reached above, although one of first impression, is consistent with those reached by courts that have decided such cases in other jurisdictions. Massachusetts imposes strict liability because a statute imposes an obligation to remove or cover the offending material. In a New York case, a landlord was held liable because a code section similar to New Haven's existed and the court found negligence in the failure to keep the premises in proper repair. *Acosta* v. *Irdank*

*Realty Corporation,* 38 Misc. 2d 859, 860–61, 238 N.Y.S.2d 713 (1963).

The violations of §§ 47a-7 and 47a-8 discussed above bring this case within the ambit of *Conaway* v. *Prestia,* 191 Conn. 484, 464 A.2d 847 (1983), in which the Supreme Court applied CUTPA to the Landlord and Tenant Act. General Statutes § 47a-1 et seq. The court finds that renting premises in which there is lead-based paint that exceeds the statutory limits is contrary to the public policy embodied in those statutes.

The acts in the present case satisfy the definition of "unfair" that the Supreme Court adopted in *Conaway* v. *Prestia,* supra. "The court thereupon proceeded favorably to cite the factors considered by the commission in determining whether an action or practice, while not explicitly in violation of the law or deceptive, is nevertheless unfair: ' "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ." ' [*FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244n, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972)]." *Conaway* v. *Prestia,* supra, 492–93.

The plaintiff offered the testimony of several experts to support her claim that Verron received and now suffers from lead paint poisoning. They included: Brian W. Cameron Forsyth, director of the lead screening program at Yale-New Haven Hospital; Diane Goodreau, an associate in research at the Yale Child Study Center; Arthur J. O'Shea, a counsel-

ing psychologist and professor at the University of Massachusetts; Arthur W. Wright, professor of economics at the University of Connecticut; and Armin Thies, a clinical neuropsychologist.

In view of their testimony, there is little doubt that Verron is severely and permanently mentally disabled as a result of lead poisoning, causing behavioral and learning abnormalities. He has a marked inability to concentrate and to organize his thoughts. It is unlikely he will be able to graduate from high school.

Wright testified that, assuming total disability, he computed Verron's loss of earning capacity over his life expectancy. The court accepts his lowest computation, which presumes Verron will complete the eighth grade, as the most realistic. The court sees little likelihood that he will enter and complete high school. Wright's computation for the completion of eight grades is $828,626.

In view of the foregoing, judgment may enter for the plaintiff to recover from the defendants the sum of $828,626, plus attorney's fees of $100,000 and costs.

The court finds that on October 21, 1988, the plaintiff filed an offer of judgment in the amount of $30,000. This filing occurred not later than eighteen months from the date of the filing of the complaint on May 12, 1987. The plaintiff, therefore, is further entitled to recover interest at the rate of twelve percent per annum on the difference between $30,000 and the total recovery of $928,626, or $898,626, from May 12, 1987. This sum is $152,766 as of October 12, 1989.