[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CORRECTED MEMORANDUM OF DECISION RE: MOTION TO SET ASIDE VERDICT
The plaintiffs request the court to set aside the verdict rendered in favor of the defendants. The plaintiffs sought damages on behalf of their minor son for harm suffered as a result of the child's ingesting chips of lead-based paint found on premises they leased from the defendants. They now claim, among other things, the court erred in instructing the jury that before liability could be imposed on the landlord for breach of a warranty of habitability the jury must find that the landlord failed to repair the defective condition within a reasonable time after actual or constructive notice of the defective condition reached the landlord. Because the court concludes that the imposition of immediate and unconditional liability for a violation of the warranty of habitability would be contrary to the statutory and regulatory scheme of this state, the motion to set aside the verdict is denied.
The evidence on liability shows the following occurred: On November 1, 1984, the plaintiffs rented an apartment from the defendant. Although the walls of the apartment had recently been painted, the plaintiffs noticed that the whenever the windows were opened paint chips fell from the woodwork. Their son would pick up the paint chips from the floor and ingest them. In April of 1985, the plaintiffs learned their son had been tested for the presence of lead in his blood and that an unacceptable level of lead had been detected. On May 22, 1985, an inspector employed by the Health Department of the City of Bridgeport inspected the apartment for the presence of lead-based paint on the walls, trim work, and doors. The inspector discovered high levels of lead on some window sills and other painted areas. On June 4, 1985, the inspector notified the defendants of the test results. The defendants corrected the defective areas within the apartment on June 20, 1985, and painted a front porch and window area on August 16, 1985. The inspector again examined the premises on August 26, 1985, at which time no lead-based paint hazards were found.
The plaintiffs base their theory of strict liability on General Statutes47a-7 and 47a-8. General Statutes 47a-7(a)(2) requires a landlord to "make all repairs and do whatever is necessary to put and keep premises in a fit and habitable condition . . . ." General Statutes 47a-8 provides as follows:
 "The presence of paint which does not conform to federal standards as required in accordance with the Lead-Based Paint poisoning Prevention Act, Chapter 63 of the Social Security Act, as amended, or of cracked, chipped, blistered, flaking, loose or peeling paint which constitutes a health hazard on accessible surfaces in any dwelling unit, tenament or any real property intended for human habitation shall be construed to render such dwelling unit, tenament or real property unfit for human habitation and shall constitute a noncompliance with subdivision (2) of subdivision (a) of section 47a-7."
The court instructed the jury, as requested by the plaintiffs, that the plaintiffs could base their action for damages on the statutory warranty of habitability set forth in General Statutes 47a-7(2). Historically, a tenant could not use a warranty of habitability either as a shield against the CT Page 1775 collection of rent or as a sword for obtaining compensation for personal injuries. Many jurisdictions now allow tenants to use the warranty to contest their obligation to pay rent. E.G. George Washington University v. Weintraub, 458 A.2d 43, 46 (D.C.App. 1983). Connecticut is one of these jurisdictions and has a procedure, set forth in General Statutes 47a-12, for a tenant to follow should the tenant desire to terminate a lease for the landlord's breach of the warranty of habitability. The plaintiffs herein used the warranty not as a shield but as a basis for their child's personal injury claim. While the court instructed the jury that the jury be told a landlord is liable even though the landlord lacks knowledge that a condition exists in violation of the warranty.
A survey of cases involving the ingestion of lead-based paint reveals an almost unanimous view that liability should be conditioned upon actual or constructive knowledge on the part of the landlord of the defective conditions. George Washington University v. Weintraub, supra, Dunson v. Friedlander Realty, 369 So.2d 792 (Ala. 1979); Meyer v. Parkin,350 N.W.2d 435 (Minn.App. 1984) (formaldehyde exposure); Brown v. Marathon Realty, Inc., 170 App.Div.2d 426, 565 N.Y.S.2d 219
(A.D.2d Dept. 1991); Curry v. New York Housing Authority,77 App.Div.2d 534, 430 N.Y.S.2d 305 (A.D. 1st Dept. 1980); Mahlmann v. Yelverton, 109 Misc.2d 127, 439 N.Y.S.2d 568 (Civ.Ct. of N.Y.C. 1980); Winston Properties v. Sanders, 565 N.E.2d 1280
(Ohio App. 1989); Restatement, Second, Property (Landlord and Tenant 17.6 Comment C). Two exceptions to this rule have been found. Hardy v. Griffin,41 Conn. Sup. 283 (1989); Bencosme v. Kokoras, 400 Mass. 40, 507 N.E.2d 748
(1987). When this court instructed the jury, this court adopted the reasoning of the majority opinion in the case of George Washington University v. Weintraub, supra. The court in Weintraub concluded that strict liability is not appropriate but that policy considerations call for placing on the landlord the burden of proving lack of knowledge of a defective condition.
Applying the principles of the Weintraub case, this court instructed the jury that if it found the defective condition existed before the tenants moved into the apartment, the landlord has the burden of showing a lack of notice or knowledge of the condition. The jury was further instructed that the landlord could meet this burden by showing that the landlord could not have known of the defect in the exercise of due care. The jury was instructed that if it found a defective condition arose after the plaintiffs moved into the apartment, the plaintiffs must show that the landlord received notice of the condition. The jury was also instructed that the plaintiffs were required to show that the landlord failed to repair the condition within a reasonable time after the landlord had constructive notice or actual notice. Interrogatories were submitted to the jury. The answers show that the plaintiffs did not meet their burden of proving that the defendants failed to repair the condition CT Page 1776 within a reasonable time after the defendants had actual or constructive notice of the condition. Based on this finding the jury rendered a verdict for the defendants. A review of the federal and state statutes and regulations pertaining to lead-based paint persuades this court that the jury was correctly instructed.
The imposition of strict liability whenever lead-based paint is present would not be consistent with the public policy of this state. The Commissioner of Health Services has adopted regulations pursuant to General Statutes 19a-111c for the removal of materials containing toxic levels of lead which pose an unacceptable risk of exposure to lead poisoning. Conn. State Regs. 19a-111-1 et seq. While the regulations were not in existence at the time the plaintiffs' claim arose, the regulations are similar to the federal standards mentioned in General Statutes 47a-8 and express the public policy of this state. Under the plaintiffs' theory, liability would exist whenever lead-based paint was shown to have been present without consideration of the various responsibilities of the landlord and regardless of the landlord's compliance with the regulations. The carefully crafted regulatory scheme would become meaningless in the face of such liability.
With respect to the presence of lead in a dried paint, the Connecticut regulations provide that a toxic level of lead is more than 1.0 milligrams lead per square centimeter of surface as measure on site by an X-ray fluorescence analyzer. Conn. State Regs.19a-111-1(yy)(2). Contrary to the plaintiffs' assertion, Connecticut does not require the removal or abatement of all paint surfaces which exceed this standard. Different surfaces pose different risks. The Connecticut regulations impose responsibilities which vary as the risk of harm varies. Thus, the regulations set forth different requirements for defective surfaces, chewable surfaces, and intact surfaces. A "`defective surface' means peeling, flaking, chaulking, scaling or chipping paint. . . ." Conn. State Regs.19a-111-1(x). "When a child resides in a dwelling unit all defective lead-based surfaces shall be abated." Conn. State Regs.19a-111-2(a). A "`chewable surface' means any projection one half (0.50) inch or greater from an interior or exterior surface up to five (5) feet in height that can be mouthed by a child." Conn. State Regs. 19a-111-1(m). "When a child has an elevated blood lead level then abatement shall include all lead-based chewable surfaces. . . ." Conn. State Regs. 19a-111-2(c). An "`intact surface' means a defect-free surface with no loose, peeling, chipping or flaking paint. . . ." Conn. State. Regs. 19a-1-111-1(11). "Intact surfaces containing toxic levels of lead. . .are not required to be abated. . ." CT Page 1777 unless a child with an elevated blood lead level is present and the surface is either a chewable surface or the moving part of a window. Conn. State. Regs. 19a-1-111-2(d). When a child resides in a dwelling which has a toxic level of lead on intact surfaces, the owner must monitor the intact surfaces on a regular basis so that if the surfaces become defective they will be identified and abated. Conn. State. Regs. 19a-1-111-2(e).
The federal regulatory scheme, which is mentioned in General Statutes 47a-8, has two prongs. The first prong relates to the use of liquid paint. Since 1971, the Lead-Based Paint Poisoning Act has prohibited the use of paint which contains a toxic level of lead in federally-assisted housing. 42 U.S.C.A. 4831(b); 24 C.F.R. § 35.12; 35.60. Other uses of lead-based paint are also regulated.42 U.S.C.A. 4831(a) and (b). The government has gradually decreased the amount of lead which may be placed in liquid paint. When the defendants in this case acquired their property, the term "lead-based paint" was defined as paint containing more than one percentum lead by weight in the total non-volital content of liquid paint. This definition was changed in 1973 to five tenths of one percentum of lead by weight. 42 U.S.C.A. 4841 3(A). With respect to paint manufactured after June 22, 1977, the percentage is six one-hundredths of one percentum. 24 C.F.R. § 35.61. This latter measurement is the same as that set forth in the Connecticut Regulations which define the "toxic level of lead. . .when present in paint offered for sale. . . ." Conn. State. Regs. 19a-111-1(yy)(1). The effect of the first regulatory prong is the elimination of lead-based paint in all housing built or substantially rehabilitated after 1977.
The second prong of the federal scheme relates to testing and abatement of lead-based paint hazards. Federally-assisted housing which was built or substantially rehabilitated in 1978 or thereafter should not contain lead-based paint since the first prong of the federal regulatory scheme banned the use of such paint by 1978. The federal regulations only apply to pre-1978 housing. The Lead-Based Paint Poisoning Prevention Act, 42 U.S.C.A. 4801-4846, and the regulations promulgated thereunder; see e.g. 24 C.F.R. § 35.1,92.355, and 200.800; provide for the establishment of procedures to eliminate the hazards of lead-based paint to children under the seven years of age who reside in federally-assisted housing. Defective paint surfaces, that is, cracked, scaled, chipped or loose paint, must be covered or removed. See 24 C.F.R. § 35.20 et. seq. Chewable surfaces must be tested with an x-ray fluorescent analyzer or other approved device and covered or removed if the presence of lead-based CT Page 1778 paint is detected. 42 U.S.C.A. 4822; 24 C.F.R. § 200.800, 200.820. Test reading of 1.0 milligrams per centimeter squared or higher are considered positive for the presence of lead-based paint.24 C.F.R. § 200.820. This standard, 1.0 milligrams per centimeter squared, is incorporated into the warranty of habitability created by General Statutes 47a-7(a)(2) and 47a-8.
Neither the state nor federal regulatory schemes indicate that strict liability should be imposed on landlords whose premises contain lead-based paint. Instead, the regulatory schemes set forth a testing and abatement process for defective surfaces, a testing and abatement process for certain chewable surfaces, and a monitoring process for intact surfaces. In the absence of an express legislative mandate, this scheme should not be altered by a trial court's imposition of strict liability whenever harm is caused by the ingestion of lead-based paint.
During the trial there was confusion with respect to the appropriate federal standard incorporated by General Statutes 47a-8. The plaintiffs presented evidence as to the test results which came from the use of a XRF analyzer device. The test showed the amount of lead per centimeter squared on various lead surfaces. An expert witness testified that 1.0 milligrams squared exceeds "five-tenths of lead by weight in the non-volital content of liquid." The two measurements can not be compared. One measurement, "1.0 milligrams squared," is an area measurement. The other measurement, "percent of lead by weight in the non-volital content," is a volume measurement. Each measurement is used for a different purpose. One is used to test for lead-based paint hazards on surfaces in older dwellings. The other is used to regulate the sale and use of liquid paint. At trial, the plaintiffs claimed that the standard which was incorporated into General Statutes 47a-8 for judging the toxic level of lead on a dry, painted surface was the volume measurement used to regulate the sale and use of liquid paint. Perhaps this error occurred because the volume measurement is the only one which appears in a federal statute. The other measurement appears in the federal regulations. The wrong standard was used.
Based on the foregoing, the motion to set aside the verdict is denied.
THIM, JUDGE CT Page 1779