[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is brought pursuant to General Statutes § 47a-14h[1]
by the plaintiff tenants[2] of a single family dwelling to enforce their landlord's legal duties, as required by General Statutes § CT Page 160447a-7.[3] The defendant has counterclaimed, as permitted by General Statutes § 47a-14h(f), alleging that the plaintiffs damaged the dwelling during their occupancy and have failed to pay their rent.
The amended complaint alleges that the plaintiffs are tenants of the defendant, Carl S. Amato, pursuant to a two year written lease. The demised premises is a single family dwelling in Hamden. The monthly rent is $1,500.00. On August 27, 1997, more than twenty one days before the filing of this action, the plaintiffs made complaints about the premises to the Quinnipiac Valley Health District and to the Hamden Fair Rent Commission (rent commission). The plaintiffs have not been served with a notice to quit. The plaintiffs' amended complaint alleges that the defendant failed to perform his duties under General Statutes § 47a-7 in the following respects:
 "a. Please see the copy of Quinnipiac Valley Health District Notice of Violation and Housing Inspection Report, the contents of which are incorporated herein as though fully set out; .
"b. Additionally, the heat does not function properly.
 "c. The subject premises contains an unreasonable and/or unsafe level of lead paint.
 "d. The landlord has not kept the premises in a fit and habitable condition and
 "e. The landlord has not maintained in good and safe working order and condition all plumbing and other facilities supplied by him."
The plaintiffs also claim "[t]hat the rent [of] $1,500.00 is so excessive as to be harsh and unconscionable."
In their claims for relief, the defendants seek:
 "1. An order requiring the landlord promptly to make repairs and to perform his other legal duties under local, state and federal law.
 "2. An order appointing a receiver to collect rents and to use the money to correct conditions in the property which violate local, state or federal law. CT Page 1605
 "3. An order staying other proceedings concerning the same property.
 "4. An award of money damages, which may include a retroactive abatement of rent.
"5. Attorneys fees and costs.
"6. A ruling that the lease is null and void.
 "7. An order that the plaintiffs pay use and occupancy in the amount of $675.00 per month from January 1, 1998 through August 31, 1998, with the understanding that the plaintiffs shall quit possession on or before that date.
"8. That all of the lead paint be abated forthwith.
 "9. That all money paid in the Court be returned to the plaintiff.
 "10. Such other and further relief in law or equity as the court may deem proper."
The court finds the following facts: The defendant is the owner of a forty-year old single family residential dwelling in Hamden, Connecticut. In the early 1990s, the defendant did substantial home improvements on the property. In the mid-1990s after he and his wife were divorced, the defendant listed the home for sale with a real estate agent. The multiple listing book and other advertisements stated that the lower level, or basement, was available as an in-law apartment. The plaintiffs, who were relocating from Stamford, viewed the property, and were interested in a lease-purchase agreement. They ordered a home inspection. On August 10, 1996, the parties entered into an agreement in which the plaintiffs leased the home from the defendant for a period of one year, from September 1, 1996 ("or sooner") to August 31, 1998 at a monthly rental of $1,500.00. Paragraph 29 of the lease provided: "The tenants will purchase this house on or before 9/1/98 and this lease will terminate at that time." Paragraph 30 provided: "Three Hundred Dollars ($300.00) of the monthly rental payment of fifteen Hundred Dollars ($1,500.00) shall be applied toward the purchase price of One Hundred Sixty Five Thousand Dollars ($165,000.-)."
In August, 1996, the plaintiffs moved their family of seven CT Page 1606 children, six cats and two dogs into the defendant's house. Their children were dispersed among the bedrooms. When two of the older children began having difficulty coexisting with two of the younger children, the plaintiffs granted the request of the former children to move to the basement.
The home inspection report was received by the plaintiffs about a week after they signed the lease. When the plaintiffs signed the lease, the house, as was stated in the executive summary of the home inspection, was "a well constructed and well maintained ranch style one family home, originally built approximately 40 years ago. The following major systems: roof, electrical, plumbing, water, public septic, heating and hot water are satisfactory, except where otherwise noted.
"There are no evident major structural defects, and I would expect none to occur if the regular maintenance and repairs outlined below are conducted in a timely manner.
"There are traces of lead in the paint samples taken from both the interior and the exterior. Please note that this is a limited sample and only detects the presence of lead and not the level of concentration or type. Further testing would be required to determine the relative health hazard. . . ." The problem areas of the house pointed out in the home inspection report, relevant to this action, were the roof which was in fair to poor condition and in need of replacement; the toilet in the basement; the heating and air conditioning system which was toward the end of its normal life span; the rear deck exhibited dryrot and the rear enclosed patio was deteriorated by dryrot and in need of replacement; and the aluminum gutters and downspouts which were in fair to poor condition. This report was not provided to the defendant until the second half of 1997.
The plaintiffs recognized the need to replace the roof, gutters and downspouts and agreed to do so. Within two weeks after they had signed the lease, they had obtained estimates from Sears Roofing Systems for this and other work.
Soon after moving in, the plaintiffs noted that the wood around the basement bathroom was rotted. After bringing this to the defendant's attention, the plaintiffs had the condition repaired and linoleum installed at a cost of approximately $600.00.
The plaintiffs lived in the house with apparent contentment CT Page 1607 for nearly a year, until the summer of 1997. On August 20, 1997, the plaintiffs sent the defendant a letter stating: "After repeated notification of repairs needed, we incurred the expense of $1,212.72 [in effectuating the repairs]. Thus we are subtracting this from our September rent payment of $1,500. Enclosed please find the balance of $287.28. In addition, the back stairs are rotted and there is still a water problem with the chimney and basement."
A week later, on August 27, 1997, the plaintiffs made a complaint about the house to the Quinnipiac Valley Health District (QVHD). QVHD did an inspection on August 28, 1997 and issued a housing inspection report. QVHD found numerous housing code violations: the use of the cellar as habitable space, i.e., for a kitchen and bedroom; the lack of adequate window space in the first floor kitchen; inadequate openable window area in the dining room; inadequate cellar ceiling height; water damage in the living room ceiling caused by a roof leak; water stains on the center bedroom ceiling from a roof leak; chipping and flaking defective paint surfaces on windows and door frames throughout the house; the absence of window screens in seven rooms; a loose handrail to the cellar; a broken pane of glass in the center bedroom; a missing shield on the light in the northwest bedroom; and insects living under the rug in the cellar.
At about the same time the plaintiffs commenced this action, QVHD received a final report from the State of Connecticut Department of Public Health stating that while the interior of the home contained lead in paint, the amount of lead detected (0.06%) was less than the amount permitted by law. Therefore, the chief of environmental services of QVHD determined that no lead abatement was required with respect to the interior of the home.
During the six weeks in which this action was pending before trial, the plaintiffs caused Pro-Tect, a lead testing company, to examine the house. Like the State, Pro-Tect found only non-toxic levels of lead inside the house. On the exterior, however, Pro-Tect found toxic levels of lead in some but not all areas. Moreover, the condition of the paint on the exterior was poor, with chipping and flaking paint widespread. The defendant was provided with this information on the day of, or the day before, trial. Although the plaintiffs' children had been living in the house for twenty-eight months at the time of trial, none of the children has elevated levels of lead in their blood at the time of trial.[4]
CT Page 1608
 I
The plaintiffs claim that their duty to pay rent was suspended because the premises were uninhabitable. General Statutes § 47a-4a
provides: "A rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7." Section "a" of General Statutes § 47a-7 provides: "A landlord shall: (1) Comply with the requirements of chapter 368o and all applicable building and housing codes materially affecting health and safety of both the state or any political subdivision thereof; (2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition, except where the premises are intentionally rendered unfit or uninhabitable by the tenant, a member of his family or other person on the premises with his consent, in which case such duty shall be the responsibility of the tenant; (3) keep all common areas of the premises in a clean and safe condition; (4) maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances and elevators, supplied or required to be supplied by him; (5) provide and maintain appropriate receptacles for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit and arrange for their removal; and (6) supply running water and reasonable amounts of hot water at all times and reasonable heat except if the building which includes the dwelling unit is not required by law to be equipped for that purpose or if the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection."
A tenant's right to withhold rent "is not automatic once he has alleged a breach of the landlord's statutory duty. . . . [F]or a tenant to make a successful claim that he had the right to withhold payment of rent, he must show that the landlord's failure to comply with § 47a-7(a) `materially affects his safety'; Tuckerv. Lopez, 38 Conn. Sup. 67, 69, 457 A.2d 666 (1982); or has rendered the premises `uninhabitable.' Steinegger v. Rosario,35 Conn. Sup. 151, 156, 402 A.2d 1 (1979). Furthermore, to establish uninhabitability, the tenant needs to do more than assert a unilateral, self-serving statement that the premises are untenantable. Evergreen Corporation v. Brown, 35 Conn. Sup. 549,552, 396 A.2d 146 (1978) (suggesting that a tenant `utilize the broad range of municipal boards, agencies, and commissions' to remedy defects)." Visco v. Cody, 16 Conn. App. 444, 450, CT Page 1609547 A.2d 935 (1988). "`[T]he sanctions in these sections are not triggered until and unless evidence is adduced at trial establishing that there is a substantial violation or series of violations of housing and health codes creating a material risk or hazard to the occupant[.]' P. Marzinotto, Connecticut Summary Process Manual, p. 118, citing Evergreen Corporation v. Brown, supra; Arroyo v.Fernandez, Superior Court, judicial district of Waterbury, Housing Session, Docket No. SPWA-00076 (December 9, 1982)." Id., 450-451. "`To be successful a tenant must demonstrate actual and serious deprivation of the use contemplated by the parties to the ease.'"Gayle v. Young, Superior Court, judicial district of Fairfield, Housing Session, No. SPBR 9409-27973 (Feb. 6, 1995). "The code violations must be substantial and a serious deprivation to health and safety for those to be grounds for a rent abatement or sanctions of any sort." Id. "Whether the premises are untenantable is a question of fact for the trier, to be decided in each case after a careful consideration of `the situation of the parties to the lease, the character of the premises, the use to which the tenant intends to put them, and the nature and extent by which the tenant's use of the premises is interfered with by the [conditions] claimed.' Reid v. Mills, 118 Conn. 119, 122, 171 A. 29 [1934]; seeHayes v. Capitol Buick Co., [119 Conn. 372, 378-79, 176 A. 885
(1935)]; Tungsten Co. v. Beach, 92 Conn. 519, 524, 103 A. 632
[1918]." Thomas v. Roper, 162 Conn. 343, 347, 294 A.2d 321 (1972); accord, Johnson v. Fuller, 190 Conn. 552, 556-57, 461 A.2d 988
(1983); see Hackbarth v. Ross, Superior Court, judicial district of New Haven, Housing Session, No. CV 96-7800 (August, 1997).
 A.
Because it was such a prominent part of the plaintiffs' case, the court will address separately their claim that the presence of lead paint on the house vitiates their duty to pay rent.
Prior to its repeal in 1994, General Statutes § 47a-8
provided: "Paint not conforming to standards renders property unfit. The presence of paint which does not conform to federal standards as required in accordance with the Lead-Based Paint Poisoning Prevention Act, Chapter 63 of the Social Security Act, as amended, or of cracked, chipped, blistered, flaking, loose or peeling paint which constitutes a health hazard on accessible surfaces in any dwelling unit, tenement or any real property intended for human habitation shall be construed to render such dwelling unit, tenement or real property unfit for human habitation and shall constitute a noncompliance with subdivision (2) of CT Page 1610 subsection (a) of section 47a-7." Pursuant to General Statutes §§47a-7, 47a-8, the presence of lead paint vitiated a tenant's duty to pay rent notwithstanding that the landlord had had no notice of the presence of the lead paint and had taken immediate action to correct the problem. Housing Authority v. Olesen,31 Conn. App. 359, 624 A.2d 920 (1993).
In 1994, the legislature repealed General Statutes § 47a-8. See Public Act 94-220. "[T]he legislative history suggests that the legislature repealed § 47a-8 in response to the Hardy [v. Griffin,41 Conn. Sup. 283, 569 A.2d 49 (1989)] and Olesen decisions." Gorev. People's Savings Bank, 235 Conn. 360, 393, 665 A.2d 1341 (1995). We may refer to the legislative history of an act repealing a statute to acquire a better understanding of the legislature's intent. See id.; Johnson v. Meehan, 225 Conn. 528, 545,626 A.2d 244 (1993). That history reflects that while Public Act No. 94-220 was basically a licensure bill for those who would be performing lead abatement; 37 S. Proc., Pt. 9, 1994 Sess., pp. 3076, 3078 (Remarks of Senator Kenneth L. Prztbtsz); the purpose of the provision repealing General Statutes § 47a-8 was to eliminate the rule that the mere presence of lead paint rendered a dwelling uninhabitable and provided an excuse for not paying rent. 37 H.R. Proc., Pt. 16, 1994 Sess., pp. 5743-5759 (April 29, 1994) (Remarks of Representative Robert Ward).
General Statutes § 19a-111c provides: "The owner of any dwelling in which the paint, plaster or other materials contain toxic levels of lead and in which children under the age of six reside, shall abate or manage such dangerous materials consistent with regulations adopted pursuant to this section."[5] See Regs. Conn. State Agencies § 19a-111-2 et seq. The duty to abate or manage lead, however, arises only after the owner has notice of toxic levels of lead. Rivera v. Fairbank Management Apartments,Inc., Superior Court, judicial district of Waterbury, No. LPL-CV96-0134876 (20 Conn.L.Rptr. 338, 342) (August 11, 1997).
It is the court's duty to carry out the intention of the legislature. Burns v. Barrett, 212 Conn. 176, 194, 561 A.2d 1378, cert. denied, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); see Conservation Commission v. Price, 193 Conn. 414, 430,479 A.2d 187 (1984); State ex rel. Ryan v. Bailey, 133 Conn. 40, 45,48 A.2d 229 (1946). When the legislative intent is ascertained, "our duty is imperative to give to that intention its legal effect." NewHaven Water Co. v. New Haven, 131 Conn. 456, 461, 40 A.2d 763
(1944); see Grace Hospital Society v. New Haven, 119 Conn. 146, CT Page 1611 154, 174 A. 411 (1934).
 B.
The salient aspects of the plaintiffs' claim that the premises are not fit and habitable are that (1) lead paint was found in some parts of the exterior, (2) the toilets were defective in that they constantly ran causing an undue consumption of water and very large water bill, (3) due to a defect in, or missing portion of a heating duct, the master bedroom was cooler than the rest of the house, and (4) there was water or moisture in the basement and, consequently, insects under the rug in the cellar. The court finds these matters proven. The court also finds that the plaintiffs have not proven the house to be unfit and not habitable.
The issue of lead paint, in this case, is disingenuous. Not until after this action was brought, on the eve of trial, did the plaintiffs obtain expert evidence of, and the defendant receivenotice of, toxic levels of unacceptable levels of lead paint on certain areas of the exterior. Under these circumstances, to find the house unfit and uninhabitable would flout the intention of the legislature in repealing General Statutes § 47a-8.
The matter of the master bedroom being cooler than the rest of the house is a matter of inconvenience, not a matter of habitability. This, however, is not true of the basement. The basement was represented as suitable for an in-law apartment. Not only was such a use contrary to the local housing code, but more to the point, the moisture in the basement and resulting vermin under the rug made the basement not suitable for such a use. While the plaintiffs' many cats and dogs may have contributed to the moisture in the basement, the condition was caused by moisture invading the cellar from outside.
The matter of the perpetually running toilets raises questions not wholly free from doubt. Before the plaintiffs occupied the house, the water bill was normal. At that time only the defendant occupied the house. After the plaintiffs occupied the house, the water bill was exponentially greater. Of course, the number of occupants had also increased exponentially. However, the plaintiffs did claim to have caused the toilets to be repaired in early 1997 and submitted bills for such work. While these bills appear also to include the cost for repairing the rotted foundation of the basement bathroom, the monies expended were for necessary repairs. While the bills of David Rose raise questions of authenticity, they CT Page 1612 were not seriously impeached on cross-examination. The court finds that the plaintiffs' expenditure of $1,221.72 was reasonable and necessary to discharge an obligation of the landlord under General Statutes § 47a-7.
However, applying the test stated supra, the court cannot find that the premises were uninhabitable during the time claimed, September, 1997 to December, 1997. Virtually all of the housing code violations were corrected by the defendant within a reasonable time after he received notice of them. The plaintiffs' use of the home has never been seriously impaired. The court harkens back to the plaintiffs' own home inspection report, based on an inspection made contemporaneously with their execution of the lease: This was "a well constructed and well maintained ranch style one family home, originally built approximately 40 years ago."
 II
General Statutes § 47a-14h(e) authorizes the court to order a retroactive rent abatement where a landlord has failed to perform his legal duties pursuant to General Statutes § 47a-7. While the house may not be uninhabitable, at the very least the plaintiffs' inability to use the basement in a manner for which it was warranted would warrant some rent abatement.
However, the record is devoid of evidence as to what an appropriate rent abatement would be.[6] There are few areas where the court itself may fill a gap in the evidence. See generally Tait and LaPlante's Handbook of Connecticut Evidence (2nd Ed.) § 6.2. "Courts have a general knowledge of what would be a reasonable attorney's fee for services which are fairly stated and described."Appliances, Inc. v. Yost, 186 Conn. 673, 680, 443 A.2d 486 (1982). In an appeal from an assessment of damages in an eminent domain proceeding, the rule is: "In assessing the value of the property taken, the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation."Greenfield Development Co. v. Wood, 172 Conn. 446, 451,374 A.2d 1084 (1977). However, the plaintiffs have not cited authority for the proposition that the court may divine what a fair and reasonable rental would be for this house, in this location, in Hamden in 1997. Nor may the court lop off one hundred or a few hundred dollars from the monthly rental in an effort to achieve "rough justice." The plaintiffs have not sustained their burden of CT Page 1613 proof as to the amount of their damages.
 III
The defendant has counterclaimed for unpaid rent and for damages to his house caused by the plaintiffs or their children.[7]
Since the plaintiffs have not proven by a fair preponderance that they were entitled to withhold rent, the defendant is entitled to the monies paid into court by the plaintiffs.[8] The plaintiff also is awarded $1,512.00, the amount of rent withheld by the plaintiffs in September and October, 1997.
The plaintiffs have as much as admitted that they are responsible for certain of the damages claimed by the defendant. The extent of damage is not insignificant. However, the only evidence as to the dollar amount of damages was the defendant's conclusory testimony that the cost to restore the rugs, damaged by the plaintiffs' children and pets is $2,000.00; that the cost to repair damaged paint is $2,000.00, and the total cost to restore the home to the condition it was in prior to the plaintiffs' tenancy is between $8,000.00 and $10,000.00. In addition, there were photographs taken by the defendant of certain of the damages.
The defendant had the burden of proving each element of his counterclaim by a fair preponderance of the evidence. AsbestosProducts Corporation v. Matson, 97 Conn. 381, 385, 116 A. 680
(1922); see Hartford Electric Light Co. v. Levitz, 173 Conn. 15,19, 376 A.2d 381 (1977); Gager v. Carlson, 146 Conn. 288, 290,150 A.2d 302 (1959); Robinson v. Atterbury, 135 Conn. 517, 523,66 A.2d 593 (1949); Epstein v. Heimovitch, 99 Conn. 665, 666, 122 A. 561
(1923); Williams v. Perrotta, 95 Conn. 529, 532, 111 A. 843 (1920);Sisk v. Jordan Co., 94 Conn. 384, 389, 109 A. 181 (1920);Trowbridge v. Jefferson Auto Co., 92 Conn. 569, 575, 103 A. 843
(1918); Wetherell v. Hollister, 73 Conn. 622, 626, 48 A. 826
(1901); Chris Construction Co. v. May Centers, Inc.,23 Conn. App. 453, 457, 581 A.2d 748 (1990). "A defendant prevails on a counterclaim not by reason of the weakness of the plaintiff's case, but because of the strength of his own. Silva v. Hartford,141 Conn. 126, 128, 104 A.2d 210 (1954); Thaw v. Fairfield,132 Conn. 173, 179, 43 A.2d 65 (1945)." Ruscito v. F-Dyne Electronics Co.,177 Conn. 149, 166, 411 A.2d 1371 (1979). "Under its counterclaim, the defendant had the burden of proving actionable [breach of duty] in order to recover even nominal damages. Parker v. Griswold,17 Conn. 288, 302 [1845]; Floyd v. Fruit Industries, Inc.,144 Conn. 659, 668, 136 A.2d 918 [1957]. To recover compensatory CT Page 1614 damages, the defendant had the further burden of proving the nature and extent of the damage proximately caused by the plaintiffs' [breach of duty] and the reasonable amount of the losses resulting therefrom.Stanton v. New York E.R. Co., 59 Conn. 272, 282, 22 A. 300
[1889]. It is true that mathematical exactitude in the proof of damages is often impossible, and that `all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate.' Ball v. T. J. PardyConstruction Co., 108 Conn. 549, 551, 143 A. 855 [1928]. But he `who seeks to recover damages . . . must establish a reasonable probability that . . . [the] injury [to the property] did bring about a loss . . . and must afford a basis for a reasonable estimate by the trier, court or jury, of the amount of that loss.'Ibid." Hedderman v. Robert Hall of Waterbury, Inc., 145 Conn. 410,413-14, 144 A.2d 60 (1958); see Mazzucco v. Krall Coal Oil Co.,172 Conn. 355, 360, 374 A.2d 1047 (1977). If the defendant was not prepared to bear the burden of proof on each element of his counterclaim, including damages, he should not have pursued it at the time of trial.
The defendant's lump sum conclusion that it would cost between $8,000.00 and $10,000.00 to restore the house to the condition it was in prior to the plaintiffs' tenancy is virtually useless evidence to the court and is afforded negligible weight. SeeHedderman v. Robert Hall of Waterbury, Inc., supra, 145 Conn. 414-415. As to the rugs or carpets damaged, the defendant has failed to identify the cost to replace or to repair each rug or carpet. This is necessary because the court has found that the basement carpet was not damaged primarily because of any wrongful act or omission of the plaintiffs. Id., 414-415.
The photographs taken by the defendant and admitted into evidence do illustrate that significant painting and staining will be required. The defendant estimated the cost of this work to be $2,000.00. This evidence was admitted without objection. While that figure may be on the high side, it is not unreasonable.[9]
Judgment may enter for the plaintiffs on the complaint in the amount of $1,221.72. Judgment may enter for the defendant on the counterclaim in the amount of $3,512.00. these judgments shall be paid by the respective parties at the rate of $25.00 per week. All monies paid into court by the plaintiffs may be released to the defendant. CT Page 1615
LEVIN, JUDGE