750 A.2d 10

**Joseph BENIK, et. al.**

**v.**

**Brandon HATCHER, a minor, et al.**

**No. 20, Sept. Term, 1998.**

Court of Appeals of Maryland.

April 19, 2000.

Kevin M. Murphy (William J. Carter, Lori A.F. Ridgeway, Carr Goodson Lee & Warner, on brief), Rockville, for petitioners.

Saul E. Kerpelman (Alan J. Mensh, Saul E. Kerpelman & Assocs., on brief), Baltimore, for respondents.

M. Albert Figinski, Weinberg & Green, LLC, Baltimore, Amicus Brief, for Maryland Multi-Housing Assoc.

William C. Parler, Jennifer S. Cavey, Parler & Wobber, L.L.P., Baltimore, Amicus Curiae, for Property Owners Assoc. of Greater Baltimore, Inc.

Craig A. Berrington, Laura L. Kersey, Washington, DC, Amicus Curiae, for American Ins. Assoc.

. H. Thomas Howell, David A. Carter, Sandra A. Tofte, Howell, Gately, Whitney & Carter, LLP, Towson, Amicus Curiae, for American Ins. Assoc.

Kenneth W. Strong, Baltimore, Amicus Curiae, for Maryland Trial Lawyers Assoc.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

BELL, Chief Judge.

In this case, we are asked to decide whether, under the Consumer Protection Act ("CPA"), Maryland Code (1975, 1990 Repl.Vol.) Title 13 of the Commercial Law Article, specifically § 13–301(1), (2) and (3),[1] proof of scienter is a prerequisite to

---

**1.** Unless otherwise indicated, all Code references are to Title 13 of the Commercial Law Article, Maryland Code (1975, 1990 Repl.Vol.).

holding a landlord liable for breach of warranty for injuries resulting from a child's ingestion of lead-based paint, when the child's dwelling, at the inception of the lease, contained chipping and flaking paint, in violation of the local housing code.[2] The Court of Special Appeals held that scienter is not required and, so, reversed the judgment of the trial court. We shall affirm the intermediate appellate court, but on a somewhat different analysis.

## I.

The genesis of this case was a complaint that alleged that five year-old Brandon Hatcher, the respondent, suffered lead poisoning while living in apartment # 310 in an apartment building located at 1411 Division Street, owned by Joseph Benik, the petitioner. Brandon and his family moved into the apartment in January 1990 and in December 1990, an inspection of the apartment revealed that lead paint was present in several areas throughout the apartment. After the discovery of the lead paint, the family moved to another apartment in the same building.

Brandon's mother received Section 8[3] assistance to subsidize her rental payments while she and her family lived at 1411 Division Street. Thus, consistent with Section 8 procedures, on January 2, 1990, prior to the family moving into the apartment, an inspection of the unit was conducted by a Section 8 housing inspector. That inspector testified at trial that the apartment passed the Section 8 inspection, which included inspecting each room in the unit for the presence of chipping or flaking paint. Confirming the inspector's testimo-

---

**2.** No issue with regard to the measure of damages has been raised by the parties or decided by the Court, *see* Maryland Rule 8–131(a), and, accordingly, we will not address it.

**3.** Section 8 is a federal program whereby the United States Department of Housing and Urban Development subsidizes a tenant's rental of housing by paying the landlord the difference between what the tenant has been determined to be able to pay and the fair rental value of the premises. *See,* § 8 of United States Housing Act of 1937, as amended, 42 U.S.C.A. § 1437f (1994).

ny, the petitioner testified that he had painted the apartment several weeks before the inspection. He also testified that Mrs. Hatcher was in the apartment and inspected it herself before entering into the lease. Further, the petitioner stated that, several months earlier, when she rented another apartment in the same building, Mrs. Hatcher signed a statement that she had received a booklet regarding the hazards of lead-based paint.

The testimony of both the Section 8 inspector and the petitioner was contradicted by the testimony of Chakeda Hatcher, Brandon's sister. Twelve years old when the Hatcher's moved into the unit, Chakeda stated that the apartment was not freshly painted when the family moved in. She described chipping paint on the wall, ceiling, around the door frame, and the windowsills. She also stated that she saw chipping paint in the bathroom and in two bedrooms. Chakeda further testified that she witnessed Brandon with a chalky substance around his hands and mouth after he had been playing near holes located at the baseboard of the apartment. She specifically stated that the holes were present when they moved into the apartment. Finally, Chakeda testified that the petitioner was in the apartment before the lease began, talking to her mother.

Chakeda's testimony was corroborated by Brandon's aunt, Eileen Hatcher, who testified that she resided in apartment # 214 the entire time her sister and nephew lived in apartment # 310. Ms. Eileen Hatcher testified that she visited her sister within the first month of her moving into apartment # 310 and observed, at that time, that the unit was not freshly painted. She further stated that, on different occasions, when she visited the apartment, the paint on the windowsill of the middle room and kitchen was peeling and flaking.

On October 17, 1990, Brandon was diagnosed with lead poisoning, having been found to have an elevated blood lead level. At that point, the family moved out of their apartment and into another unit. Brandon's blood lead level began to decline once the family moved out of apartment # 310. On

December 3, 1990, the Baltimore City Health Department conducted an investigation at the residence, finding lead paint nuisances in sixteen areas throughout the apartment, around the frames, baseboards, and windows. That inspection and its findings resulted in the issuance to the petitioner of an emergency violation notice and an order to remove the lead paint nuisance.

Suit was filed in the Circuit Court for Baltimore City[4] against the petitioner.[5] Although the complaint contained five counts, only two of them, those alleging negligence and violation of the Consumer Protection Act, survived the pre-trial practice. Those counts proceeded to trial before a jury. At the end of the case, the trial court gave the following instruction as to the Consumer Protection Act:

"Plaintiff has made a claim under the Maryland Consumer Protection Act. In order to recover damages under this act, the Plaintiff must prove more likely than not the following: One, that at the beginning of the lease of Apartment 310, there was chipping and flaking *lead-based* paint; and two that Mr. Benik was aware of the chipping and flaking *lead-based* paint, and also aware that its condition may constitute an unreasonable risk of harm to the tenants. And three, that despite the above, the Defendant, Mr. Benik failed to disclose the hazardous condition to Linda Hatcher at the beginning of the lease. And Four, that Brandon Hatcher was injured as a direct, proximate result of the alleged hazardous condition that existed at the time of the lease; that is chipping or flaking *lead based* paint. If any of the above elements are missing, the claim hereunder should be decided in favor of the defendant."(emphasis added).

---

**4.** The suit was originally filed on Brandon's behalf by his mother as next friend. When she died, his aunt was substituted as Brandon's next friend.

**5.** The petitioner's wife was also named as a defendant, as was Orchid Street Garden Associates. The petitioner's wife was dismissed from the case on motion for judgment at the end of the plaintiff's case. The claims against Orchid Street Garden Associates were voluntarily dismissed.

The respondent excepted to this instruction, asking the court to give his proposed instruction instead. The respondent's proposed instruction did not require the jury to find scienter on the part of the petitioner, that the petitioner be aware that the chipping and flaking paint was lead-based paint or that the condition was an unreasonable risk to the respondent.

The jury returned a verdict in favor of the petitioner on all counts. The respondent noted an appeal to the Court of Special Appeals. In an unpublished opinion, that court affirmed the trial courts evidentiary rulings, but reversed its judgment with respect to the Consumer Protection Act ("CPA"). The intermediate appellate court reasoned: [6]

---

**6.** Underlying this reasoning is the analysis of the Court of Special Appeals in *Hartford Acc. and Indem. Co. v. Scarlett Harbor Associates Ltd. Partnership,* 109 Md.App. 217, 279 n. 16, 674 A.2d 106, 136 (1996), adopted by that court in its decision in this case, distinguishing the factual scenario in *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994), from one arising under the CPA:

"The *Golt [v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986)] rule imposing liability in the absence of scienter should be distinguished from the Court of Appeals's decisions in two lead paint cases: *Scroggins v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994), and *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994). In both of those cases, the Court held that the leasing of a dwelling with lead-based paint that was not chipped or peeling was not, in itself, a violation of the CPA. *Scroggins,* 335 Md. at 696, 645 A.2d 1160; *Richwind,* 335 Md. at 661, 645 A.2d 1147. In *Richwind,* the Court reached this conclusion by reasoning that a rule imposing CPA liability for lead paint hazards that occurred during the term of the lease would in effect "impose strict liability on landlords throughout the term of the lease." 335 Md. at 684, 645 A.2d 1147.

"The Court's avoidance of "strict liability" must be read in context. The basis of the Court's decision in both cases was that the CPA only governs "deceptive trade practices which induce the prospective tenant to enter into ... a lease." *Id.,* 335 Md. at 683, 645 A.2d 1147; *Scroggins,* 335 Md. at 696, 645 A.2d 1160. The CPA does not, however, govern "statements or omissions concerning the leased premises during the term of the lease." *Richwind,* 335 Md. at 683, 645 A.2d 1147; *Scroggins,* 335 Md. at 696, 645 A.2d 1160. Thus, leasing a dwelling with "intact" lead-based paint was not a CPA violation because the lead-paint hazard did not exist at the time the lease was created.

"In the case at bar, the Council has alleged that the defendants made false statements in the purchase agreements to induce purchas-

"*Golt [v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986) ] holds that these subsections do not require scienter. *Richwind [Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994) ] and *Scroggins [v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994) ] hold that with lead-paint issues as between a landlord and a tenant, the CPA only applies at the inception of the lease and a landlord cannot be held strictly liable throughout the term of the lease. Reading the cases and the CPA together, we find no prohibition against finding a landlord strictly liable for acts or omissions at the beginning of the lease. Indeed, at the beginning of a lease, landlords are in a better position than tenants to know of any defects within a rental property. We, therefore, hold that the CPA does not always require scienter. Whether there is a viable strict liability cause of action under the CPA in this case can be determined by a two-pronged test: 1) Did the landlord commit *an* act or omission that falls under one of the CPA's subsections that does not require knowledge, and 2)Was the act or omission of the landlord at the inception of the lease?"

The petitioner timely filed a Petition for Writ of Certiorari, which we granted to consider the important issue this case presents.

## II.

The petitioner's primary argument is that, where the landlord does not have actual knowledge or reason to know of the condition, the CPA does not impose strict liability on a landlord in lead-based paint cases for failing to inform tenants at the inception of the lease that the premises contain chipping or flaking lead-based paint. Relying on *Scroggins v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994); *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994) and *Hayes v. Hambruch,* 841 F.Supp. 706 (D.Md.1994), *aff'd,* 64 F.3d 657

---

ers to buy Condominium units. As such, the statements would be governed by *Golt* and not by *Richwind* or *Scroggins.*"

(4th Cir.1995),[7] he contends that "a required element of any

---

7. The respondent points out that the date of the lease in *Hayes v. Hambruch*, 64 F.3d 657 (4th Cir.1995) predated the amendment of the CPA to include consumer realty and, thus, that case could only have addressed the applicability of the CPA during the term of the tenancy. It should also be noted that the decision quotes extensively from the discussion of the negligence count in *Richwind*, 335 Md. at 670–82, 645 A.2d at 1151–57, but does not give the same attention to the CPA count. Even in its discussion of the negligence count, the court failed to recognize that *Richwind* noted the CPA's applicability to conditions at the inception of the lease, perhaps because the factual situation with which it was faced was mid-lease. Moreover, *Richwind*'s reliance on the District Court opinion in *Hayes* was limited to its consideration of the negligence count. See 335 Md. at 678, 645 A.2d at 1155.

The petitioner cites a number of out of State cases, *Felton v. Spratley*, 433 Pa.Super. 474, 640 A.2d 1358 (1994); *Acosta v. Irdank Realty Corp.*, 38 Misc.2d 859, 238 N.Y.S.2d 713 (1963); *Garcia v. Jiminez*, 127 Ill.2d 615, 136 Ill.Dec. 585, 545 N.E.2d 109 (1989); *Tillman v. Johnson*, 612 So.2d 70 (La.1993); *Hardy v. Griffin*, 41 Conn.Supp. 283, 569 A.2d 49 (1989); *Norwood v. Lazarus*, 634 S.W.2d 584 (Mo.App.1982); *Underwood v. Risman*, 414 Mass. 96, 605 N.E.2d 832 (1993), which he says have rejected a rule that would impose an affirmative duty on landlords to inspect premises for lead-based paint. In none of those cases was the issue the applicability of a consumer protection statute, as in this case, although one of the cases, *Hardy v. Griffin*, rests on a similar rationale as, and is consistent with, *Golt*. In another, *Tillman v. Johnson*, the Supreme Court of Louisiana reversed the intermediate appellate court's affirmance of summary judgment in favor of the landlord, ruling that "a genuine dispute as to whether the lead-based paint on the defendants' respective properties presented an unreasonable risk of harm to the petitioner's minor child for purposes of strict liability under La. Civ.Code art. 2317."

Only *Felton v. Spratley* stands for the proposition for which it was cited. Indeed, that case distinguished the other cases on which the petitioner relies. 640 A.2d at 1364 n. 2. It is interesting to note, however, that, in that case, the lack of actual knowledge on the part of the defendant was conceded, the basis for liability being premised on

> "the novel argument that the level of knowledge relating to the hazards associated with the use or presence of lead-based paint proliferated to the stage that '[b]y 1987 ... it was commonly known to the general public and certainly should have been known [constructive notice] to one who rents low income housing, such as the defendants who rents low income housing, such as the defendants ... [so as to create] an affirmative duty to inspect for and remove lead paint.'"

*Id.* at 1361. Moreover, the court acknowledged that no legislation similar to that in *Hardy v. Griffin* and *Tillman* was in existence in Pennsylvania.

In *Acosta v. Irdank Realty Corp.*, the court found that the landlord had knowledge of the condition of the apartment, which contained lead-

claim for personal injury under the CPA based on an alleged omission is scienter, or that the landlord know, or have reason to know, of the alleged hazard or condition." That is consistent, he maintains, with the common law requirement that a landlord have notice of a defect and the opportunity to correct it before being held liable. Therefore, the petitioner asserts:

"The Court of Special Appeals' ruling misinterprets prior decisions of this Court, directly contradicts a federal court decision on the same issue, and fails to acknowledge that its decision reverses many years of common law precedent on the issue of notice, without any clear proof of an intent on the part of the legislature to make such a sweeping change ... [and] effectively reverses this Court's holding in *Richwind* that a landlord is under no duty to inspect premises to determine whether a defective condition exists."

Further, the petitioner argues that § 13–301(9) of the CPA, by its terms, applies to omissions and expressly requires proof of scienter.[8] He maintains that "[a]n omission is the nature of

---

based paint, rented to the plaintiff's parents and, therefore, was negligent in failing to keep the premises in proper repair. 238 N.Y.S.2d at 714–15. The question of the landlord's negligence was determined to be a jury issue in *Garcia v. Jiminez*, 184 Ill.App.3d 107, 132 Ill.Dec. 550, 539 N.E.2d 1356, 1359 (1989). The court in *Norwood v. Lazarus* found in favor of the plaintiff, noting the knowledge of one landlord and that the other either knew or should have known of the presence of lead-based paint. 634 S.W.2d at 588. In *Underwood v. Risman*, the landlord did not own the premises when the injured child resided in the premises or when the child's injuries occurred and, therefore, had no statutory duty to disclose. 605 N.E.2d at 835. Moreover, in that case, there was no evidence of flaking, loose or peeling paint or of any other Housing Code violation. *Id.*

**8.** Section 13–301, "Proscribed practices," provides as relevant:

"Unfair or deceptive trade practices include any:
"(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;
"(2) Representation that:
 "(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

the alleged landlord liability in this case" and, therefore, that § 13–301(9) controls, and is dispositive of this case. Unlike § 13–301(9), the petitioner contends, § 13–301(1) and (2) of the CPA, in addition to being much less specific, only apply to affirmative misrepresentations. While conceding that § 13–301(3) does apply to omissions, the petitioner believes that it is too non-specific to be read as eliminating the scienter requirement.

The petitioner argues, alternatively, that any error that the trial court may have committed in instructing the jury with respect to scienter was harmless. Pointing out that the jury found for the petitioner on the negligence count, he submits that, necessarily having weighed the evidence in deciding that count, "[t]he jury could not have found for defendant on the negligence claim without deciding that the paint was in good condition at the inception of the lease."

As could be expected, the respondent sees it quite differently. He contends that, properly read, *Richwind* and *Scroggins* are distinguishable from the case *sub judice*. Those cases, he asserts, were concerned with conditions arising during the tenancy and not, as in this case, a condition in existence at the inception of the lease. Not only does the Consumer Protec-

---

"(ii) A merchant has a sponsorship, approval, status, affiliation, or connection which he does not have;

"(iii) Deteriorated, altered, reconditioned, reclaimed, or second-hand consumer goods are original or new; or

"(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

"(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \* \*

"(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

"(i) The promotion or sale of any consumer goods, consumer realty, or consumer service; or

"(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

"(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental. . . ."

tion Act draw that distinction and accord cases in each category different treatment, the respondent argues, but so too does the common law draw the same distinction. He also agrees with the intermediate appellate court, thus disputing the petitioner, that § 13–301(1), (2) and (3) are applicable in the instant case and, as *Golt* explained, do not contain a scienter requirement. Consequently, the respondent maintains that the Court of Special Appeals got it right.

## III.

The issue in this case arises in the context of a jury instruction, the correctness of which this Court must determine. Maryland Rule 2–520(c) provides:

"The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given."

In *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651, 655 (1979), we had this to say about the giving of jury instructions:

" 'A litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it.' *Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258, 265 (1974); *Fowler v. Benton,* 245 Md. 540, 548–549, 226 A.2d 556, cert. denied, 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967); *Dorough v. Lockman,* 224 Md. 168, 171, 167 A.2d 129 (1961). Thus, the general rule regarding instructions to the jury has two aspects: (1) the instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury."

Stated differently, a proposed instruction that is "a correct exposition of the law," that is "applicable in light of the evidence before the jury," and is not "fairly covered by the instructions actually given," *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 495–96, 639 A.2d 701, 709 (1994) (quoting *Wegad*

*v. Howard Street Jewelers*, 326 Md. 409, 414, 605 A.2d 123, 126 (1992)), must be given. Thus, "[i]t is well settled that if, when read as a whole, the court's instructions to the jury clearly set forth the applicable law, there is no reversible error." *CSX Transp., Inc. v. Continental Ins. Co.*, 343 Md. 216, 240, 680 A.2d 1082, 1094 (1996), citing *Nizer v. Phelps*, 252 Md. 185, 202–03, 249 A.2d 112, 122 (1969); *Alston v. Forsythe*, 226 Md. 121, 135, 172 A.2d 474, 481 (1961).

The instruction in this case required that, in order for the landlord to be liable for breach of warranty under the CPA for the tenant's injuries, there must have existed in the apartment at the inception of the lease, chipping and flaking *lead-based* paint, of which the landlord was aware and did not inform the tenant, even though he was aware that the condition may constitute an unreasonable risk of harm to the tenant, and that the chipping and flaking *lead-based* paint was the proximate cause of the tenant's injuries. The correctness of that instruction—the determination whether it sets forth the applicable law—requires analysis of sections of the Baltimore City Code, the CPA and our cases elucidating those enactments.

IV.

A.

The purpose of the Baltimore City Housing Code is to:

"establish and maintain basic requirements, standards and conditions essential for the protection of the health, safety, morals and general welfare of the public . . . in the City of Baltimore; to establish minimum standards governing the condition, use, operation, occupancy and maintenance of dwellings . . . in order to make the dwelling safe, sanitary and fit for human habitation"

*See,* Baltimore City Code (1983 Repl.Vol.), Art. 13 § 103. To achieve that purpose, the landlord has been required by law to deliver premises to a tenant in a safe and habitable condition. Thus, Article 13, § 702 of the Baltimore City Housing Code provides:

"Every building and all parts thereof used or occupied as a dwelling shall, while in use . . . be kept in good repair, in safe condition, and fit for human habitation. . . ."

Section 703 addresses the standards for the good repair and safe condition of interior walls, ceilings, woodwork, doors, and windows. It defines that standard as requiring that they be kept clean and free of any flaking, loose, or peeling paint. § 703(2)(c). Section 706 similarly provides as to interior wall covering and paint:

"All interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition. No paint shall be used for interior painting of any dwelling, dwelling unit, or rooming unit unless the paint is free from any lead pigment."

The Code prohibits an owner from "leas[ing] or permitt[ing] the subletting to another for occupancy any vacant or vacated dwelling or dwelling unit which does not comply with [its] provisions. . . ." § 1001. Finally, § 9–14.1 of the Baltimore City Code of Public Local Laws (1980) provides:

"In any written or oral lease or agreement for rental of a dwelling intended for human habitation, the landlord shall be deemed to covenant and warrant that a dwelling is fit for human habitation."

After examining the foregoing provisions of the Baltimore City Code in *Brown v. Dermer*, 357 Md. 344, 744 A.2d 47 (2000), this Court concluded:

"[I]t is clear that it is unlawful to lease a dwelling with flaking, loose or peeling paint and that no premises are to be leased for human habitation, except those that are fit for human habitation, *i.e.*, those that are kept in good repair and safe condition as defined in the Baltimore City Code. To be sure, § 706 prohibits the use of lead-based paint for interior painting in a dwelling unit; however, neither it nor §§ 702 or 703 limits the prohibition of flaking, loose or peeling paint to lead-based paint. To be a violation, all that must be shown is that there was flaking, loose or peeling paint, without any further showing as to the content of the

paint. Moreover, none of the provisions of the Housing Code premises violation on the landlord's knowledge of the hazards of lead-based paint."

*Id.* at 361, 744 A.2d at 56–57.

## B.

The CPA prohibits a person from engaging in "any unfair or deceptive trade practice" in connection with certain enumerated activities. § 13–303.[9] Among the activities subject to that proscription are the lease or rental, and the offer for lease or rental, of consumer realty.[10] § 13–303(1) and (2). *See Golt v. Phillips,* 308 Md. at 8, 517 A.2d at 331; § 13–301.

Section 13–301 is relevant to the resolution of this case. As pertinent to the facts of this case, it provides:

"Unfair or deceptive trade practices include any:

"(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

"(2) Representation that:

"(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, char-

---

**9.** That section provides:

"A person 'may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
 "(1) The sale, lease, rental, loan, or bailment of any consumer goods, *consumer realty,* or consumer services;
 "(2) The offer for sale, lease, rental loan, loan, or bailment of consumer goods, *consumer realty* or consumer services;
 "(3) The extension of consumer credit; or
 "(4) The collection of consumer debts."

**10.** As originally enacted, see Chapter 49 of the Acts of 1975, the Consumer Protection Act did not apply to the sale or lease of real property. By amendment in 1976, however, the General Assembly made it apply to "certain real property transactions, certain activities related to these transactions, and certain leases and rentals...." Ch. 907 of the Acts of 1976. *See CitaraManis v. Hallowell,* 328 Md. 142, 150, 613 A.2d 964, 968 (1992).

acteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \* \*

"(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;
"(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \* \*

"(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

"(i) The promotion or sale of any consumer goods, consumer realty, or consumer service; or

"(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

"(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental. . . ."

## C.

One of the issues presented in *Golt* was "whether the leasing of an unlicensed dwelling unit constitutes an unfair or deceptive act under Maryland's Consumer Protection Act (CPA)." 308 Md. at 1, 517 A.2d at 329. There, an elderly, disabled retiree responded to an advertisement for the rental of a furnished apartment. Upon inspecting of the apartment and finding it in need of cleaning and repairing, and receiving assurances that the necessary work would be done, he signed a month-to-month lease, paid a month's rent and a security deposit and moved into the apartment. Having learned after moving in that the toilet facilities were located outside of his apartment and that he would have to share them with another

tenant and after getting no response to repeated requests for repairs, he called the Baltimore City Department of Housing and Community Development, which inspected the premises, discovering, among other code violations, that the landlord did not have the necessary license or inspection to operate the building as a multiple dwelling. *Id.* at 5–6, 517 A.2d at 330. To resolve that issue, this Court interpreted § 13–301(1), (2) and (3), in light, however, of the applicable provision of the Baltimore City Code, concluding ( *id.* at 9, 517 A.2d at 332), "[i]n our view, advertising and renting an unlicensed dwelling violates § 13–301(1), (2), and (3) [of the CPA]":

"Implicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful. Baltimore City Code, Art. 13, § 1101 (1983 Repl. Vol.), expressly prohibits the operation of any multiple family dwelling without a license or temporary certificate. As Phillips Brothers had neither a license nor a temporary certificate, it violated the City Code. Phillips Brothers could not provide Golt with the unimpeded right to possession during the lease term. Consequently, Phillips Brothers advertisement and rental of the apartment was a 'misleading ... statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.' Maryland Code (1983 Repl.Vol.), § 13–301(1) of the Commercial Law Article.

"Furthermore, such a representation is in essence a representation that the 'realty ... [has] a sponsorship, approval ... [or] characteristic ... which [it does] not have,' *id.* § 13–301(2)—namely, licensing for operation as a multiple family dwelling. It makes no difference that Appellees did not expressly state that the premises were properly licensed; such a basic prerequisite to any lease agreement is implied. For consumer protection purposes, the meaning of any statement or representation is determined not only by what is explicitly stated, but also by what is reasonably implied. *Spiegel, Inc. v. Federal Trade Commission,* 411 F.2d 481, 483 (7th Cir.1969); *Aronberg v. Federal Trade Commission,* 132 F.2d 165, 167 (7th Cir.1942): *In the*

*Matter of Seekonk Freezer Meats, Inc.,* 82 F.T C. 1025, 1054 (1973).

"Finally, Phillips Brothers also violated § 13–301(3) of the CPA, which states that the failure to disclose a material fact, which deceives or tends to deceive, is an unfair or deceptive trade practice. The lack of proper licensing is a material fact that Phillips Brothers failed to state. In addition, failure to disclose this fact deceived Golt or at least had the tendency to deceive consumers. An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action. *See, e.g., Charles of the Ritz Distributors Corp. v. Federal Trade Commission,* 143 F.2d 676, 679–80 (2d Cir.1944); *Gulf Oil Corp. v. Federal Trade Commission,* 150 F.2d 106, 109 (5th Cir.1945); cf. *Restatement (Second) of Torts,* § 538 (1977) (Under common law fraud, a fact is deemed material if a reasonable person would attach importance to its existence in determining his choice of action.). In our view, the lack of proper licensing for an apartment under most circumstances is a material fact that any tenant would find important in his determination of whether to sign a lease agreement and move into the premises. (Footnote omitted).

*Id.* at 9–10, 517 A.2d at 332.

In *Richwind,* this Court again interpreted the CPA and considered, albeit in a somewhat different context, the very provisions of the Baltimore City Code at issue in this case. At issue in *Richwind* were the extent to which provisions of Baltimore City ordinances and Public Local Laws supersede the common law rule that, before being held liable for negligence, a landlord must have notice of a particular defect and a reasonable opportunity to correct it and whether the CPA imposes strict breach of warranty liability for personal injury upon a landlord without requiring proof of knowledge, deception, reliance, or causation. 335 Md. at 666, 645 A.2d at 1149. There, at the invitation of the owner's management company, the tenant, who resided in the premises prior to their acquisition by the landlord, forwarded a series of complaints about

the disrepair of her apartment, including "[chipping and flaking] paint and plaster from the walls." *Id.* at 668, 645 A.2d at 1150. The president of the management company dispatched workers to correct the problems, but did not inspect the work to determine whether the repairs had been made adequately. *Id.* After her two children were diagnosed with elevated blood lead levels, the Baltimore City Health Department inspected the property and served the owner and the management company with notice of violations and required removal of the lead hazards. *Id.* at 668–69, 645 A.2d at 1150. Evidence developed at trial indicated that, although he had no specific knowledge about the presence of lead-based paint in the defendant's building, the president of the management company knew that buildings like it often contained lead-based paint. The trial court granted the defendants' motion for judgment on the CPA count and submitted the negligence count to the jury, which returned a verdict in favor of the plaintiff. The Court of Special Appeals affirmed the jury verdict, but reversed as to the CPA. We did likewise—affirmed the judgment of the intermediate appellate court as to negligence, but reversed as to the CPA.

As to the negligence verdict, we accepted the defendants' concession that certain provisions of the Baltimore City Code (1983 Repl.Vol.), *i.e.*, Art. 13, §§ 702, 703 and 706, impact the common law requisites of liability and may impose a duty on a landlord to protect a tenant from injury, 335 Md. at 670–71, 645 A.2d at 1151, and, thus, agreed that their violation by a defendant could provide the basis for a negligence action. *Id.* at 671–72, 645 A.2d at 1152 (citing *Restatement (Second) of Property, Landlord and Tenant* § 17.6 (1977)).[11] Concluding

---

11. Section 17.6 provides as follows:
"A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
"(1) an implied warranty of habitability; or

that "the relevant issues in the instant case are ... whether the city code's notice provisions expand common law liability, and whether Richwind or its agent had adequate notice and/or knowledge of this hazardous lead paint condition," *id.* (citing Baltimore City Code (1983 Repl.Vol.), Art. 13, §§ 301, 302 and 303), we held that there was sufficient evidence both of notice to the landlord and of the landlord's breach of the duty to correct the dangerous condition. The Baltimore City Code provisions we referenced were Art. 13, §§ 301 [12] and 303, [13] however, rather than §§ 702 and 703, both of which established an implied warranty of habitability. 335 Md. at 673, 645 A.2d at 1152. Concerning the City Code's effect on a landlord's common law liability, we held that they did not supercede the common law's notice requirement. *Id.* at 674–75, 645 A.2d at 1153. As to that, we explained:

"the common law and the city code appear consistent with each other as they apply to the prerequisite of knowledge and/or notice. Both require that a landlord have notice of the dangerous condition on the property and a reasonable opportunity to correct it. Neither impose upon Richwind a duty to periodically inspect the premises during the leased period for dangerous conditions to determine if repairs are necessary. To hold otherwise would circumvent years of unbroken precedent concerning such a duty, and might force landlords to become the "insurers" of their tenants, a policy which has been repeatedly rejected by the courts of this State. *See Scott,* 278 Md. at 165, 359 A.2d at 552 (reiterating that "mere ownership of buildings does not render the owner liable for injuries sustained by tenants

---

"(2) a duty created by statute or administrative regulation."

**12.** That section provides:

"Whenever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided."

**13.** That section similarly required the Commissioner to "order the necessary corrections by notice and service" as therein provided.

since the landlord is not an insurer of such persons"); *Ramsey*, 265 Md. at 321, 289 A.2d at 323 (asserting that "the owner is not an insurer of the safety" of those rightfully on the premises"); *Elmar Gardens, Inc.*, 227 Md. at 457, 177 A.2d at 265 (stating that "mere ownership of land or buildings does not render the owner liable for injuries sustained by tenants or invitees rightfully on the premises, for the owner is not an insurer of such persons but owes them the duty only to exercise ordinary care")." (Footnote omitted).

*Id.*

Turning to the CPA, the Court made clear that its non-applicability was due to the fact that the defective condition arose during the term of the lease, rather than at its inception. After reviewing the history of the CPA's applicability to landlord-tenant matters, and noting that the only times that this Court has applied the CPA in landlord/tenant cases have been where the unfair or deceptive practice occurred during the establishment of the landlord/tenant relationship between the parties, *see Golt*, 308 Md. at 11, 517 A.2d at 333; *Citara-Manis*, 328 Md. at 149 n. 3, 613 A.2d at 967 n. 3; *Galola v. Snyder*, 328 Md. 182, 185, 613 A.2d 983, 985 (1992), the Court held:

> "The CPA applies to a lease at the time the consumer enters into it, and the Act is intended to govern deceptive trade practices which induce the prospective tenant to enter into such a lease."

*Id.* at 683, 645 A.2d at 1158. Continuing with that theme, having acknowledged that comprehensive landlord and tenant statutes, as well as the common law, regulates a landlord's acts or omissions during the term of the lease, we stated our doubt that "the legislature intended the CPA to be applicable to statements or omissions concerning the leased premises occurring during the term of the lease." 335 Md. 661, 683, 645 A.2d 1147, 1158. Finally, concerned that the Court of Special Appeals's interpretation of the CPA would hold a landlord liable for the nondisclosure of a condition arising during the

term of the lease, of which the landlord has no knowledge, and would impose strict liability on landlords throughout the term of the lease, the Court opined, on the subject, as follows:

"It is reasonable to assume that the General Assembly intended to limit application of the CPA to material misstatements and omissions at the inception of the lease rather than during the full term of the lease. At the time the lease is entered into, a landlord has superior knowledge as to the condition of the premises. During the term of the lease, however, when the tenant is in exclusive possession and control of the premises, it is the tenant who has superior knowledge of the property's condition. If we were to hold otherwise, a landlord conceivably could be found liable under the CPA for a dangerous condition created by a tenant during the term of the lease without any notice from the tenant to the landlord or any opportunity for the landlord to correct it. Such a decision could impose a standard amounting to strict liability for any defect arising on the premises during the term of the lease. We do not believe the legislature intended to extend the scope of the CPA to impose such a standard on landlords.

"Although the premises leased in the instant case obviously contained lead-based paint, that alone would not have rendered them uninhabitable or in violation of the CPA. Renting a premises with intact, lead-based paint is not in itself a violation of the CPA. The plaintiff's CPA claims were based on the landlords' failure to disclose that there was peeling, chipping, or flaking lead-based paint which constituted an unsafe condition. There was no evidence that at the time the lease was entered into there was any peeling or chipping paint. As we have indicated, mere silence about a condition that arises during the term of this lease, rather than prior to or at the time the lease is entered into, is not a violation of the CPA. Cf. *Miles v. Shauntee,* 664 S.W.2d 512, 518–19 (Ky.1983) (holding that failure of a landlord to make repairs required by the housing code is not a violation of the consumer protection act).

"In the instant case, the tenants had exclusive possession and control of the premises for two years prior to Richwind taking title. If there was any false or deceptive trade practice involved in leasing these premises, it would have been engaged in by Richwind's predecessor in title, the Baitches, who settled the claims made against them. Consequently, Richwind's post-lease silence does not give rise to a CPA cause of action."

*Id.* at 685–86, 645 A.2d at 1159 (footnote omitted).[14]

## V.

To be sure, the condition about which the respondent complained was the existence of flaking and chipping paint. The petitioner's negligence in the maintenance of the respondent's apartment or in failing to correct the condition after the lease began is not at issue in this case. That aspect of the case was resolved by a jury verdict in favor of the petitioner. As we have seen, the respondent also alleged, supported by proof, that the apartment contained chipping and flaking paint when the lease was entered into. It is the correctness of the jury instruction given in connection with this aspect of the case and the proper application of the CPA that are at issue.

■ As we have seen, a landlord leasing or agreeing to rent a dwelling intended for human habitation is deemed to covenant and warrant that it is fit for human habitation. § 9–14.1, Baltimore City Code of Public Local Laws. Thus, the provi-

---

**14.** *Richwind* does not stand for the proposition for which the petitioner cites it. What has always to be kept in mind is the context of the *Richwind* decision; what was at issue there was the viability, under the CPA, of a complaint based on a landlord's acts or omissions during the course of the lease. To be sure, the Court stated its concern that the effect of the intermediate appellate court's decision to apply the CPA under the facts of that .case could be to impose strict liability throughout the term of the lease, but that statement was in response to the posture of the case, in mid-lease, rather than at the beginning. Prior to making that statement, the Court had traced the application of the CPA to landlord/tenant cases in Maryland and noted how comprehensively the acts and omissions of landlords are regulated even without the application of the CPA. 335 Md. at 683–84, 645 A.2d at 1157.

sions of the City Code, *i.e.*, §§ 702, 703, and 706, setting minimum standards and thereby giving meaning to the implied warranty, rather than §§ 301 and 303, the notice provisions, are the ones that are relevant. To prove a violation of the CPA premised on the breach of the implied warranty of habitability, it must be shown that, at the inception of the lease, the landlord made material misstatements or omissions, which either had the tendency to or, in fact, did, mislead the tenant. Thus, the landlord must have knowledge, constructive or actual, of the condition of the premises at the time of the lease.

■ The implied warranty provisions establish a threshold for the lease of premises and that threshold is based on the purpose of the Baltimore City Housing Code, to "make dwellings safe, sanitary and fit for human habitation," for the benefit of "the health and safety of the people." These provisions, like the Code of which it is a part, are applications of the police power of the City of Baltimore. *See McBriety v.City of Baltimore*, 219 Md. 223, 231, 148 A.2d 408, 414 (1959); *Heubeck v. City of Baltimore*, 205 Md. 203, 208, 107 A.2d 99, 102, (1954); *Maryland Mortg. & Inv. Co. v. State*, 25 Md.App. 8, 11, 332 A.2d 675, 678–79 (1975); Section 6(24) of the Baltimore City Charter. They are examples of public health and safety regulations. *See Golt*, 308 Md. at 13, 517 A.2d at 334. The City has a vital interest and public purpose in ensuring the habitability of its housing stock and in the health and safety of its people. *See Maryland Mortg. & Inv. Co.*, 25 Md.App. at 12, 332 A.2d at 678.

■ Ordinarily in the case of police regulations, violation gives rise to penalty, irrespective of the motive or knowledge of the violating party, "for the law, in those cases, seems to bind the party to know the facts, and to obey the law at his peril." *Carroll v. State*, 63 Md. 551, 551, 3 A. 29, 30 (1885). That is not the case here, however. The City Code provides, as we have seen, for notice and prescribes a time in which any violation may be corrected. Nevertheless, ignorance of the law is no defense. *Golt*, 308 Md. at 10, 517 A.2d at 332;

*Samson v. State,* 27 Md.App. 326, 334, 341 A.2d 817, 823 (1975); it will not relieve one who commits a wrongful act from the legal consequences of that act. *Flohr v. Coleman,* 245 Md. 254, 267, 225 A.2d 868, 875 (1967). Indeed, everyone is "presumed to know the law regardless of conscious knowledge or lack thereof, and are presumed to intend the necessary and legitimate consequences of their actions in its light." *Samson,* 27 Md.App. at 334, 341 A.2d at 823 ( citing *Grumbine v. State,* 60 Md. 355, 356).

 Just as a motorist is presumed to know the law regulating the use of motor vehicles, *Flohr,* 245 Md. at 267, 225 A.2d at 875, so too is a landlord presumed to know the requirements of the City Code pertaining to the habitability of leased premises. In either case, it is the actions and omissions that have the legal effect the law prescribes, and thus must be evaluated, not the actor's knowledge or ignorance. *Id.; Glenn L. Martin Co. to Use of American Mut. Liability Ins. Co. v. Fidelity–Baltimore Nat. Bank & Trust Co.,* 218 Md. 28, 37, 145 A.2d 267, 272 (1958).

Here, sections 702, 703 and 706 of the City Code prescribe the standard for the lease of premises for human habitability and § 9–14.1 deems every lease of premises for that purpose to contain a warrant of their fitness for that purpose. In his pre-lease communications with the respondent's mother, the petitioner did not disclose that there was chipping and flaking paint, as the respondent's evidence showed, and may have, impliedly or expressly, represented the opposite. The petitioner's statement or omission must be viewed in light of the City Code and Public Local Law requirements, whether or not the petitioner was aware of them. He argues, however, that he neither had actual knowledge of the chipping or flaking paint or reason to know of the condition. The petitioner supports that argument by pointing to our holding in *Richwind* that a landlord is under no duty to inspect premises for defective conditions.

 As the owner of the premises and the landlord, on whom the law imposes specific duties and obligations in con-

nection with the lease of the premises, including implying a representation as to the premises' condition at the time of the lease, the law imputes the requisite knowledge to the petitioner. *See James Clark Co. v. Colton,* 91 Md. 195, 204–205, 46 A. 386, 388 (1900) (holding that, despite their denials, the officers of a bank, conceded to have been insolvent for years, must have known, or ought to have known, of its insolvency when payments determined to be unlawful and fraudulent preferences were made.) Assuming that the *Richwind* holding applies even to the inception of the lease,[15] the law presumes the existence of a condition that a reasonable inspection, had it been conducted would have uncovered. In other words, the

---

**15.** It is true that we recognized in *Richwind* that "a landlord is under no duty to inspect the premises in order to determine whether [hazardous] conditions exist." 335 Md. at 677, 645 A.2d at 1155. It is significant, however, that the statement was made during the discussion of the negligence count and not the CPA count. Also of significance is the fact that we acknowledged that "[a]t the time the lease is entered into, a landlord has superior knowledge as to the condition of the premises." *Id.* at 685, 645 A.2d at 1159. Because it is during the term of the lease, when the tenant has exclusive possession, that the tenant has superior knowledge of the property's condition, it follows, logically, that it is during the term of the lease that the landlord does not have a duty to inspect.

Although there was no viable CPA claim in *Scroggins,* the CPA analysis in *Richwind* applies to its companion case, *Davis v. Stollof.* In *Scroggins,* the plaintiffs moved out of the apartment prior to the CPA becoming effective as to rental properties. 335 Md. at 694, 645 A.2d at 1163. In *Davis v. Stollof,* the Court commented on the CPA claim, as follows:

"At the time the lease in the present case was entered into, there was no chipping or peeling paint on the premises. As the chipping or peeling paint did not exist at the time the lease was entered into the landlord cannot be said to have engaged in a deceptive trade practice under the CPA. As a matter of law, defendants are entitled to summary judgment on the issue of their alleged violation of Maryland's Consumer Protection Act."

*Id.* at 696, 645 A.2d. at 1164.

Thus, the petitioner's argument that the decision in this case conflicts with *Scroggins* is simply not persuasive. Although our statement of what *Richwind* decided was not tempered, 335 Md. at 696, 645 A.2d at 1164, we did point out, as the petitioner conceded, that the complaint in that case concerned a condition occurring after the beginning of the lease. *Id.* at 694, 645 A.2d at 1163. In any event, *Richwind* has always to be interpreted in its factual context.

landlord need not inspect the premises before leasing, but because of the implied representation that accompanies the making of the lease, he or she fails to do so at his or her peril. This recognizes, as we noted in *Richwind,* 335 Md. at 685, 645 A.2d at 1159, that "[a]t the time the lease is entered into, a landlord has superior knowledge as to the condition of the premises." Moreover, to hold otherwise would be to encourage landlords not to take seriously the obligations imposed upon them by the City Code; they would be placed in a better position due to their willful ignorance than they would have been in if they had performed their duties. *Id.*

It is not disputed that the petitioner never informed the respondent of the presence of chipping and flaking paint on the premises at the time the premises were let, maintaining to the contrary, that no such condition existed at that time. Nevertheless, although disputed—there being testimony that the apartment was freshly painted, passed a Section 8 inspection and the respondent inspected the premises before renting it—there was evidence from which the jury could have found that there was chipping and flaking paint in the apartment at the inception of the lease. Which of the various factual scenarios to accept was for the jury to determine.

The presence of chipping and flaking paint in the apartment at the inception of the lease, like the lack of a license in *Golt,* both being questions of fact, in addition to being a Housing Code violation, could be the predicate for the jury to find a violation of the CPA: implicit in the rental of an apartment is the representation that the rental is lawful, *Golt,* 308 Md. at 9, 517 A.2d at 332, and that the apartment is in good repair, in safe condition and fit for human habitation, § 9–14.1; an apartment with flaking, loose and peeling paint has not been maintained "in good repair and safe condition" and, therefore, is in violation of the Housing Code; § 1001 makes it illegal to rent a dwelling unit containing Housing Code violations. Had the jury credited the testimony of the respondent's sister, it could then have found that the rental of the apartment in this case violated § 13–301(9) of the CPA, as well as the same provisions as the rental of the apartment in *Golt.*

The rental of the apartment without disclosing the flaking, loose or peeling paint would violate § 13–301(1) in that it would be a "misleading . . . statement . . . or other representation," having the capacity, tendency, or effect of deceiving or misleading the respondent. The implicit representation that the apartment ". . . [has] a sponsorship, approval . . . [or] characteristic . . . which [it does] not have," namely, it was in good repair and safe condition and, thus fit for human habitation, would violate § 13–301(2), because whether an apartment is in good repair and safe condition, which, as the Housing Code defines the terms, include being free of flaking, loose and peeling paint, is, to one looking for an apartment, a material fact. Moreover, the failure to disclose it could be found by a jury to deceive or to have the tendency to deceive. Accordingly, the jury could have found that the petitioner's failure to inform the respondent of the condition of the premises violated § 13–301(3).

The petitioner argues that the applicable section of the CPA is § 13–301(9), which, by its terms, requires the proof of "knowing concealment, suppression, or omission of any material fact" and of scienter—"the intent that a consumer rely on the same." For this subsection to be applicable, the omission must have been in connection with at least one of three circumstances, only one of which, "(i) [t]he promotion or sale of any consumer goods, consumer realty, or consumer service," is offered by the petitioner in support of his argument.[16]

---

16. The petitioner offers another reason for its conclusion that the Legislature intended § 13–301(9) to apply to landlord/ tenant transactions:

"In 1976, when the legislature amended the CPA to include unfair and deceptive procedures specifically in the rental and offer for rental of consumer realty, the General Assembly did so by adding words concerning realty and leases, but only to certain specific subsections, rather than by an inclusive change to the entirety of § 13–301. The only change in the 1976 Act that is relevant to an alleged omission, as opposed to an affirmative misrepresentation, by a landlord is in subsection (9)(i) and (ii), where the Act added the words 'consumer realty,' 'lease,' and 'rental.' "

While the petitioner correctly details the 1976 amendments to § 13–301, that was not the only section of the CPA that was amended.

As we have indicated, in Baltimore City, the rental of an apartment with flaking, loose and peeling paint is like renting an apartment in an apartment building without a license for the operation of that building; both are violations of the Housing Code. To be sure, a reasonable inspection of the apartment may have revealed the existence of the flaking, loose and peeling paint, but not the lack of a license. That distinction is not critical to the resolution of this case, however. The instructions in this case are erroneous in two respects: they hinge liability on the landlord's knowledge that the chipping and flaking paint was lead-based and they do not take account of any presumption of knowledge. We have determined that the landlord who leases premises for human habitation is presumed to have knowledge of any defective condition that a reasonable inspection would have disclosed and, as previously indicated, the factual dispute that the former situation presents is a matter for the jury to determine after proper instructions.

## VI.

Finally, the petitioner maintains that the jury necessarily found, by its verdict, that the apartment did not have flaking, loose and peeling paint at the inception of the lease, any error that the trial court may have committed instructing the jury was harmless. He reasons:

> "the jury decided the negligence count in favor of Benik by weighing the evidence and finding that, at the beginning of the lease there was no flaking paint. There was substantial evidence, as shown by the testimony of housing inspector William Lohr, that there was no flaking paint.... Mr. Benik and his assistant also testified that the paint was fresh and intact, when they were in the unit prior to commencement of the lease .... moreover, Ms. Hatcher did not note any flaking paint on her pre-lease inspection .... the Hatchers relied entirely on the testimony of twelve year

Significantly, § 13–303, defining unfair and deceptive trade practices, was amended to insert the phrase, "consumer realty."

old Chekeda Hatcher, sister of Brandon Hatcher, that she recalled flaking paint throughout the apartment at the beginning of the lease.... In order to decide the negligence issue, the jury had to weigh this evidence, and must have decided that there was no flaking paint at the inception of the lease. Otherwise, the jury would have found for the plaintiff."

 It is well settled that a civil judgment will not be reversed unless the complaining party shows both error and prejudice. *See, e.g., Fish Market Nominee Corp. v. G.A.A., Inc.,* 337 Md. 1, 15, 650 A.2d 705, 711–12 (1994); *Harris v. Harris,* 310 Md. 310, 319, 529 A.2d 356 (1987). *See State of Md. Deposit Ins. Fund Corp. v. Billman,* 321 Md. 3, 16–18, 580 A.2d 1044, 1051–52 (1990). There is prejudice when the error influenced the outcome of the case. *Beahm v. Shortall,* 279 Md. 321, 330–31, 368 A.2d 1005, 1018 (1977); *State Roads Comm. v. Kuenne,* 240 Md. 232, 235, 213 A.2d 567, 568 (1965).

 We agree with the respondent. The jury was instructed that, to find a violation of the CPA, there must have been, at the beginning of the lease, "chipping and flaking lead-based paint" and that the petitioner "was aware of the chipping and flaking lead-based paint." As we have seen, what the Housing Code proscribes is "flaking, loose and peeling paint," not flaking, loose and peeling lead-based paint. Moreover, the jury was not asked specifically whether there was flaking, loose or peeling paint, lead-based or otherwise, and the special verdict sheet does not reflect any such finding. It is thus quite conceivable that the jury determined that there was flaking and chipped paint in the apartment at the inception of the lease, but that the petitioner was not aware that it was lead-based. As the respondent notes, the petitioner testified that he believed that if there was lead-based paint in the premises, it was covered up, encapsulated by new walls and sheet rock installed during renovation. From this, we can plausibly surmise, as the respondent contends, that "[t]he jury simply found that the Defendant was not negligent (under the 'reason to know' standard of *Richwind* ) and did not violate

**538**

the CPA (under the flawed instructions given by the court below)."

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**

RODOWSKY, RAKER and CATHELL, JJ., dissent.

CATHELL, Judge, dissenting.

I respectfully dissent.

## I.

In my view, the majority has misconstrued its holding in *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986). *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), and *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160 (1994)concerned whether a landlord had knowledge of the *fact* that a dangerous condition had come into being in the leased premises after the commencement of the leased term.[1] *Golt* imposed strict liability on landlords to know what the statutory law was, i.e., that a license was required to operate a rental unit. *Golt* did not create strict liability in respect to the factual requirements of negligence actions or actions under the Consumer Protection Act (CPA). We merely noted in *Golt* that: "Ignorance of the law ... is no defense." 308 Md. at 10, 517 A.2d at 332.

The instant case does not involve ignorance of the law. It involves knowledge of a fact. It is clearly distinguishable. *CitaraManis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992), and *Galola v. Snyder*, 328 Md. 182, 613 A.2d 983 (1992), relevant portions of which were cited in *Richwind* as support for the Court's interpretation of *Golt*, were, like *Richwind*, cases generally involving the CPA. But the portions of *Citara-Manis* and *Galola* cited by the Court in *Richwind* and *Scroggins* to support the decisions therein dealt with the holding in

---

1. *Richwind* and *Scroggins*, though not companion cases, involved the same legal issue, and both opinions were filed on the same day.

*Golt* that a landlord is charged under the CPA with knowledge of the law at the inception of the lease. *Richwind, Scroggins,* and *Golt,* in my view, should not be interpreted as holding that landlords are charged with knowledge of facts. *Golt, Citara-Manis, Galola, Richwind* and *Scroggins* do not support the majority's creation of strict liability,[2] in respect to knowledge of facts, in CPA cases based on alleged violations of the Baltimore City Housing Code or similar provisions.[3] Landlords are presumed to know the law, but are not charged with automatic knowledge of the existence of facts that, if actually known, would constitute violations of the law.

Moreover, neither *Golt, CitaraManis* nor *Galola* involved actions for alleged negligent conduct. All three cases arose out of a rental contract, alleging actions for restitution or for rent, in circumstances in which there was no dispute that the landlord had failed to obtain the required licenses. *Citara-Manis* presented two issues: (1) whether a tenant was entitled under the CPA to restitution for rent paid during a period when the leased premises were unlicensed; and (2) whether a tenant is entitled to restitution of voluntary rental payments made on an unenforceable lease. Accordingly, *CitaraManis* was a restitution case. Similarly, *Galola* involved rental units for which the required license had not been obtained. The tenant, after being sued for possession and back rent, counter-sued for restitution of all the rent he had paid during the term that the premises had been unlicensed. *Galola* was also resolved on restitution issues. As I perceive the cases, neither *Golt, CitaraManis* nor *Galola* have anything to do with the case at bar. The comment in *Richwind* that "[t]o date, this Court has only applied the CPA in landlord/tenant cases where the unfair or deceptive practice occurred during the

---

**2.** The majority holds that "[a]s the owner of the premises and the landlord ... the law imputes the requisite knowledge to the petitioner." In my view, the majority, by its use of such language, imposes "strict liability" on a landlord under the CPA.

**3.** The Court in *Scroggins,* 335 Md. at 694 n. 2, 645 A.2d at 1163 n. 2, expressly noted: "As set out in *Richwind* ... the CPA does not create a new remedy in strict liability for lead paint poisoning cases."

establishment of the landlord/tenant relationship between the parties," 335 Md. at 683, 645 A.2d at 1157 (citing *Golt,* 308 Md. at 11, 517 A.2d at 333; *CitaraManis,* 328 Md. at 149 n. 3, 613 A.2d at 967 n. 3; *Galola,* 328 Md. at 185, 613 A.2d at 985), is, as I perceive it, being interpreted much too broadly. The crucial determinant in those cases was that they both involved the inception of the leases **and** premises that were unlicensed. The landlords were thus held to have knowledge that the law required them to have licenses. *See Golt,* 308 Md. at 10, 517 A.2d at 332 ("Ignorance of the law ... is no defense."). Under the common law applicable to this case, ignorance of facts can be a defense. There is nothing in any of the cases, except the overly-broad language in *Richwind,* that indicates otherwise.

If the holdings of *Golt* and its progeny are considered in light of the narrowness in which the Court framed those opinions, there is nothing in those cases supporting the creation of strict liability, even under the CPA, for landlords in negligence cases brought against them by their tenants. The prior cases of this Court have held that a landlord is liable only if he knows, or has reason to know, of the defective condition or should realize the risk involved. *See Hayes v. Hambruch,* No. 94–1271, 1995 WL 479892 (4th Cir. Aug.15, 1995) (citing *Richwind,* 335 Md. 661, 645 A.2d 1147; *Bartholomee v. Casey,* 103 Md.App. 34, 651 A.2d 908 (1994)), *aff'g,* 841 F.Supp. 706 (D.Md.1994).

The United States District Court for Maryland noted in *Hayes,* 841 F.Supp. at 713, that this Court had observed in *Golt* that "ignorance of the law ... is no defense. A landlord must be held to be aware of all laws concerning the validity of leasing its premises." The District Court continued: "It is thus apparent that the Court of Appeals in essence imputed knowledge to the landlord of the fact that the premises were unlicensed." *Hayes,* 841 F.Supp. at 713. That court proceeded to discuss the issue of knowledge of the law as if it was knowledge of a fact. In that discussion, the District Court mistakenly interpreted *Golt* as distinguishing between the type of facts which a landlord would be more likely than the

tenant to know, i.e., whether the premises were licensed. *See id.* at 713–14.

In its affirmance of *Hayes*,[4] the United States Court of Appeals for the Fourth Circuit modified the District Court's findings, stating:

Hayes cites *Golt*, in which the Court of Appeals of Maryland found a CPA violation where a landlord rented premises without first having a license to do so. When the defendant claimed that it did not know that the dwelling unit was not properly licensed, the court replied,

[i]gnorance of the law, however, is no defense. A landlord must be held to be aware of all laws concerning the validity of leasing its premises.... In other words, § 13–301(1), (2), and (3) does not require scienter on the part of the landlord; the subsections require only a false or deceptive statement that has the capacity to mislead the consumer tenant.

In essence, the court held the defendant liable because the landlord should have known of the relevant law.

The instant case differs somewhat from *Golt*, because Hambruch claims that she was unaware of the existence of a factual matter, not of the law. However, under the reasoning of *Golt*, *we find that a landlord must have reason to know of the material facts underlying an allegedly false or misleading representation before he or she can be held liable for a violation of the Maryland CPA.* As we pointed out above, Hayes has failed to produce any evidence tending to show that Hambruch had reason to know of the dangerous condition in the residence on North Caroline Street. She thus cannot sustain a claim under the Maryland CPA.

---

**4.** *Richwind* was decided after the District Court's decision in *Hayes,* but prior to the Fourth Circuit's review of *Hayes*. The Fourth Circuit's affirmance was by way of an unpublished opinion. Because I believe that the appellate court's affirmance modified the language of the District Court's opinion, and because the District Court's opinion is cited by the majority in this case, I have included portions of the Fourth Circuit's opinion in this dissent.

Our conclusion ... is bolstered by the Maryland Court of Appeals' reluctance to impose a standard of strict liability on landlords. As the Court of Appeals has stated, "the CPA does not create a new remedy in strict liability for lead paint poisoning cases." *Scroggins,* 335 Md. at 694 n. 2, 645 A.2d at 1163 n. 2.

*Id.* at \*4 (some citations omitted) (emphasis added). The majority is no longer reluctant.

## II.

Additionally, I believe that the majority is expanding the language of *Golt* beyond what was being considered in that case. Contrasting sections 13–301(1), (2), and (3) of the CPA with section 13–301(9), the case before us more appropriately falls under subsection (9), which requires a "knowing concealment [of facts] ... with the intent that a consumer rely on the same...." Initially, I note that, if subsections (1), (2), and (3) are as broad as the dicta in *Golt* and *Richwind* seem to indicate and as broad as the majority in this case indicates, the quoted language from subsection (9) would be surplusage. There is no factual situation I can conceive of which involves alleged negligent acts by landlords that would not be covered by the majority's broad interpretation of *Golt* and subsections (1), (2), and (3) of section 13–301.

*Golt* was a limited holding in respect to the general assumption that a landlord is presumed to know the law, an issue not in controversy in the instant case. By overstating the reach of *Golt* in *Richwind,* the Court set the stage for the position it now takes. In doing so, however, it renders subsection (9) meaningless.

We said in *Prince George's County v. White,* 275 Md. 314, 319, 340 A.2d 236, 239–40 (1975):

To sustain the contention advanced by the county would necessarily lead to one of two possible consequences, both of which are regarded with disfavor by this Court. To ignore subsection (r) entirely would either mean its repeal by implication, a construction which should be avoided, *see Bd.*

*of Fire Comm'rs v. Potter, supra[* 268 Md. 285, 300 A.2d 680 (1973)]; *Planning Comm. v. Silkor Corp.,* 246 Md. 516, 524–25, 229 A.2d 135 (1967); *Kirkwood v. Provident Savings Bank,* 205 Md. 48, 55–56, 106 A.2d 103 (1954); or that it be regarded as superfluous. Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase, let alone an entire subsection, shall be rendered surplusage, superfluous, meaningless or nugatory. *St. Paul Fire & Marine Ins. Co. v. Insurance Commissioner,* 275 Md. 130, 339 A.2d 291 (1975); *A.H. Smith Sand & Gravel v. Dep't, supra,* 270 Md. at 659 [, 313 A.2d 820]; *Baltimore City v. United Stores,* 250 Md. 361, 368–69, 243 A.2d 521 (1968).

*See also Tracey v. Tracey,* 328 Md. 380, 387–89, 614 A.2d 590, 594–95 (1992).*Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632, 566 A.2d 94, 97 (1989); *Brodsky v. Brodsky,* 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990) ("[W]e look first to its language, ... we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary.")

I have found no indication in the finite legislative history of the CPA that it was intended to supplant, in its entirety, the long-established common law relating to negligence actions brought by tenants against landlords. It is, I respectfully suggest, the better view that section 13–301(9) codified, as a statutory violation, what was already part of the common law relating to negligence actions between tenants and landlords. In that respect, the common law requirement that, in order to be liable, a landlord had to have knowledge of the defect or should have had such knowledge is preserved by the subsection (9) requirement that the concealment must be knowing.

The majority's position, and its interpretation of *Golt* (and *Richwind*'s interpretation *of Golt* ) are contrary to the long-established common law relating to tenant/landlord negligence actions. We noted a firmly-established principle in *Bradshaw v. Prince George's County,* 284 Md. 294, 302, 396 A.2d 255, 260 (1979), *overruled in part* by *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980), and *Cox v. Prince George's*

*County,* 296 Md. 162, 460 A.2d 1038 (1983), when we said: "It is presumed that the legislative body did not intend to make any alteration of the common law other than what is plainly stated." *See also Hardy v. State,* 301 Md. 124, 131, 482 A.2d 474, 478 (1984); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 355–56 (1934).

There is no plainly-stated intention expressed anywhere in the CPA that the common law principles applicable to actions such as the instant case are to be repealed and substituted with the strict liability cause of action the majority now bootstraps onto *Golt,* a decision that merely held that a landlord is presumed to know the law. To now hold that it makes no difference whether a landlord actually knows the facts, or should know the facts, because the CPA and *Golt*'s holding as to presumptions of law have turned tenant actions into strict liability offenses, stretches *Richwind*'s misinterpretation of *Golt* to completely abrogate the common law. I see nothing in the statute, or its legislative history, supporting such a drastic change in Maryland law. Given the inclusion of subsection (9) in section 13–301 specifically to create the offense of "knowing concealment," such an intent, in my view, cannot be implied from the general language of the statute.

Judges RODOWSKY and RAKER have authorized me to state that they join in Part I of the dissent.

RODOWSKY, Judge, dissenting.

I respectfully dissent. In addition to the unwarranted extension of *Golt v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986), as described in Part I of Judge Cathell's dissenting opinion, I believe that the Court, by superimposing the Consumer Protection Act (CPA) on a negligence action for personal injuries, has created a hybrid that imposes liability without fault—a result under the CPA that never could have been intended by the General Assembly to apply to claims for personal injuries.

I

A legal premise of the majority opinion is that a cause of action lies under the CPA if the deceptive trade practice

occurred before the lease, when the practice had the "capacity, tendency, or effect of deceiving or misleading" the consumer, here, respondent's mother. Maryland Code (1975, 1990 Repl. Vol.), § 13–301(1) of the Commercial Law Article (CL). In *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), the claim that was asserted under the CPA was for personal injuries. We held that a claim under the CPA did not lie in that case because the Legislature did not intend "the CPA to be applicable to statements or omissions concerning the leased premises occurring during the term of the lease." *Id.* at 683–84, 645 A.2d at 1158. From this the majority assumes that *Richwind* stands for the opposite result in the converse factual situation, that is, that the CPA applies to personal injury claims if the deceptive trade practice occurs before the transaction has been consummated, and the practice misleads the consumer into entering into the transaction.[1] Under the majority's analysis, the critical time for a cause of action under the CPA in the circumstances involved here was before the respondent's mother committed to lease the apartment.

The factual foundation for the majority's CPA cause of action consists entirely of the following passage from the direct examination of respondent's sister, Chekeda Hatcher (Ms. Hatcher). The background of the testimony is that Ms. Hatcher, her mother, the infant plaintiff, and another brother had been living in Apartment 205 at 1411 Division Street in Baltimore City. In January 1990, the family moved to Apartment 310 in the same building because Apartment 205 was too small.

"Q Can you tell the ladies and gentlemen of the jury what was the condition of Apartment 310 when you first moved in?

---

**1.** The larger question—whether the CPA applies at all to personal injury claims—was not argued or directly addressed in *Richwind*. In *Berg v. Byrd*, 124 Md.App. 208, 720 A.2d 1283 (1998), a landlord-tenant lead paint case, the only issue was whether the injury, for which noneconomic damages were sought, arose after the effective date of the cap on noneconomic damages. Again, the larger question was not argued to, or directly addressed by, the Court of Special Appeals.

"A It wasn't freshly painted. It was paint like paint chips all—the wall, the ceiling and around the door frame and in the windowsills and stuff.

"Q Can you tell us specifically in what rooms did you see this condition?

"A It wasn't in the bathroom. It was like in that first room and then—mainly in the middle room.

"Q Did you ever see [the petitioner] in Apartment 310?

"A Yes.

"Q Did you ever see [the petitioner] in Apartment 310 when you first moved in?

"A Uh-huh.

"Q Okay, can you tell us about that?

"A He had came up there, I guess, how my mother was talking, I guess, I don't know. But he was up there with my mother.

"Q That was when you first moved into the apartment?

"A Uh-huh."

In my opinion "when [the family] first moved in" refers to a time after the tenancy began.[2] Under Ms. Hatcher's testimony the jury could infer that the petitioner had notice of chipping paint at that time. The circuit court instructed on the negligence count that, if the petitioner had actual notice of chipping paint (not limited to lead-based), and if the jury further found that the petitioner "had reason to know that any peeling paint in these premises may contain lead-based paint," and if the other elements of a negligence action were present, then the jury could find for the respondent. This instruction

---

2. The majority opinion [op. at 512] states that Ms. Hatcher testified "that the petitioner was in the apartment *before the lease began,* talking to her mother." (Emphasis added). I cannot conclude that the testimony, quoted above, is susceptible of that interpretation. Further, if the majority's interpretation were correct, and the respondent's mother, the consumer here, had this conversation with petitioner in Apartment 310 before the lease began, then the consumer would have seen the flaking paint prior to the lease as easily as did her daughter, Ms. Hatcher, and the consumer would not have been misled.

was predicated on standard landlord-tenant law under which the landlord, once having received notice of a defect, and, having reason to know that it is dangerous, has a duty to repair. The jury found for the landlord on the negligence count.

In instructing on the CPA count, the court told the jury that it must find "that at the beginning of the lease of Apartment 310" the petitioner "was aware of the [presence of] chipping and flaking lead-based paint." From Ms. Hatcher's testimony that there was flaking paint in the apartment, observable to her while the petitioner was in Apartment 310 when the family "first moved in," it is a fair inference that the flaking paint was also present prior to the beginning of the lease. But, evidence of notice after the family moved in is not evidence that the landlord had notice prior to the beginning of the tenancy.

Because the respondent failed to produce any evidence that the petitioner had notice of flaking paint as of the critical time for CPA purposes, there could be no cause of action under the CPA; consequently, the circuit court's inclusion in the CPA instruction of a requirement for notice of flaking lead-based paint would be immaterial, *unless no pre-lease notice of flaking paint is required.* Even assuming that a CPA action lies for personal injuries, this case does not involve whether a landlord must know that flaking paint is lead-based paint in order for the action to lie. Rather, the issue is whether the landlord must have pre-lease notice of flaking paint for a CPA action to lie.

Inasmuch as there is no evidence that the petitioner was on pre-lease notice of flaking paint, the only way in which an action under the CPA could lie, under the majority's view of a CPA action and under the facts of this case, is if notice is not required for a CPA action. The majority glosses over this substantial problem by creating a presumption that the landlord is on pre-lease notice of any condition that a reasonable inspection of the apartment would have revealed. Further, the majority uses that fiction to create a deceptive trade

practice by holding that there is an implied misrepresentation resting on the landlord's silence in not having advised the tenant prior to the lease about flaking paint on the premises. In short, the CPA action created by the majority rests on non-disclosure of that of which the landlord had no notice at the critical time. That is, to my mind, liability without fault, and I do not believe that the General Assembly intended the CPA to have that effect in personal injury actions.

## II

Creating a presumption that a landlord knows of conditions that would be revealed by a reasonable pre-occupancy inspection of the premises is indistinguishable from declaring that there is a general tort duty to make a pre-occupancy inspection, even in the absence of a contractual requirement. As recently as 1994, this Court said that

"a landlord is under no duty to inspect the premises in order to determine whether such conditions exist. *See Restatement (Second) of Torts* § 358 cmt. *b* (stating that a lessor 'is under no duty to his lessee ... to make such an inspection'). *See also Kleiman v. Mono of Maryland, Inc.,* 254 Md. 548, 553–55, 255 A.2d 393, 396–97 (1969) (adopting § 357 of the *Restatement (Second) of Torts,* and stating that a landlord is under no duty to inspect the property unless a contract so provides); [*State ex rel. Bohon v.*] *Feldstein,* 207 Md. [20,] 33, 113 A.2d [100,] 106 [ (1955) ]; *New Summit Associates v. Nistle,* 73 Md.App. 351, 361, 533 A.2d 1350, 1355 (1987)."

*Richwind,* 335 Md. at 677, 645 A.2d at 1155. In enacting the CPA, the General Assembly could not have intended to over-turn several centuries of landlord-tenant law concerning the absence of a duty to inspect.

*Golt,* 308 Md. 1, 517 A.2d 328, on which the majority relies, does not support creating the duty. As Judge Cathell points out in his dissenting opinion, *Golt* rests on the principle that the landlord was chargeable with knowledge of the applicable legal requirement that the premises be licensed. That deci-

sion is not precedent for imputing to the landlord knowledge of facts of which there is no notice.

Further, the majority's combination of presumed knowledge and implied misrepresentation creates, in effect, a warranty of habitability. The General Assembly has never enacted a warranty of habitability on a statewide basis for the market in previously-occupied, residential-rental properties, and this Court should not use the CPA to create one.

By Chapter 481 of the Acts of 1971, the General Assembly did enact an implied warranty of fitness for human habitation applicable to rental dwellings in Baltimore City. *See* Code of Public Local Laws of Baltimore City (1980 ed., 1997 Cum. Supp.), § 9–14.1. That enactment requires notice and, if notice is given, the remedies available and the time within which to seek those remedies are restricted. In relevant part § 9–14.1 provides:

"(a) In any written or oral lease or agreement for rental of a dwelling intended for human habitation, the landlord shall be deemed to covenant and warrant that the dwelling is fit for human habitation. If the dwelling is not fit for human habitation, the tenant, in addition to any remedies which he otherwise has, is entitled to the following remedies that shall be exercised within thirty (30) days of occupancy:

"(1) An action or proceeding for breach of contract or warranty which may include a prayer for rescission of the contract.

"(2) Rescission of the contract including the return of all deposits and money towards rent paid during the period of the breach of the warranty of habitability and within the thirty (30) days of occupancy period. Provided, however, that no action or proceeding for breach of the warranty of habitability shall be instituted by any tenant unless the landlord has notice of the conditions on the premises which constitute the breach of the warranty of habitability.

"(b) Definitions.

. . . .

"(2) For the purpose of this section 'notice' shall mean (a) a violation notice from the Department of Housing and Community Development or any other municipal or governmental agency, (b) a letter sent by the tenant or his agent to the landlord by certified mail, or (c) actual notice of the defects or conditions."

Nothing in the CPA undertakes to eliminate the notice requirement under the Baltimore City Local Law. Indeed, the CPA could not do so because any conflict between the CPA and § 9–14.1 must be resolved in favor of the Public Local Law. *See* Maryland Code (1957, 1998 Repl.Vol.), Art. 1, § 13.

It is true that the Baltimore City Housing Code establishes standards for the maintenance of property, including that it be kept "in safe condition, and fit for human habitation." *See* Baltimore City Code (1976, 1983 Repl.Vol.), Art. 13, § 702. In addition to administrative enforcement, that statute creates a duty enforceable in a negligence action. But, both the administrative enforcement and the private remedy for damages are subject to the requirement that the landlord have notice of the violation. *See Richwind,* 335 Md. at 673–75, 645 A.2d at 1152–54.

At one point in the *Richwind* opinion, this Court referred to Article 13, §§ 702 and 703 of the Baltimore City Code as establishing an implied warranty of habitability. *Id.* at 671, 645 A.2d at 1151. We said that the warranty "necessarily includes flaking, loose or peeling *lead-based* paint within the scope of hazardous conditions." *Id.* It is perhaps this passage that led the circuit court in the instant matter to include lead-based paint specifically in its instruction on the CPA. As the majority notes, Baltimore City Code, Article 13, § 703(2)(c) requires the interior of premises to be "kept clean and free of any flaking, loose or peeling paint and paper" without limitation to lead-based paint. Nevertheless, even though *Richwind* refers to Baltimore City Code §§ 702 and 703 as creating warranties, it is clear that *Richwind* holds that an element of

any action based on those warranties is notice.[3]

## III

Implied misrepresentation is the device that the majority uses to get this action under the CPA label in an attempt to justify eliminating any notice requirement from what is otherwise a personal injury negligence action. The argument runs this way. The Baltimore City Code requires rental premises to be free from flaking paint. When the landlord rents without telling the tenant about flaking paint, which the landlord is *presumed* to know, the landlord misrepresents the condition of the premises. If the paint, in fact, is flaking lead-based paint, and injury is proximately caused, tort damages for personal injury may be obtained under the consumer protection mantel.[4]

I, on the other hand, submit that if the overlay of the CPA and of the Housing Code on the pre-lease negotiations in the instant matter results in an implied representation, any implied representation is, under *Golt*, simply that the landlord will comply with the law and repair an unsafe condition that is known to him or of which he has reason to know.

Further, the majority should not authorize converting negligence actions into implied misrepresentation actions because of the great incentive that claimants have to use a CPA action for as many negligence and products liability cases as the ingenuity of counsel can conceive. This is because the CPA changes the ordinary American rule and authorizes the court to award reasonable attorney's fees. CL § 13–408(b). An

---

**3.** The notice need not be that the flaking paint is lead-based. We have recently so held in *Brown v. Dermer*, 357 Md. 344, 361, 744 A.2d 47, 56–57 (2000), a negligence action. My disagreement with the majority is directed to eliminating—by the device of putting a CPA label on a personal injury action—the requirement in personal injury actions that the landlord have notice of flaking paint on the premises, whether lead-based or not.

**4.** Whether the majority's personal injury action under the CPA is subject to a contributory negligence defense is for another day.

anomalous and unfair result of the majority's holding, whereby an ordinary negligence action is converted into a misrepresentation violative of the CPA, is that a consumer who is injured by the negligence of a merchant may recover counsel fees on top of tort damages, but, when two motor vehicles, driven by strangers, collide, the party who is not at fault must pay counsel fees out of the tort recovery.

I would not transform the CPA into the basis for an omnibus claim that eliminates any of the elements of recognized causes of action for personal injuries. Here the respondent lost his negligence claim by the verdict of a properly instructed jury. The additional cause of action that the majority today creates under the CPA is landlord tort liability, but without the element of notice.

For these reasons I would reverse the judgment of the Court of Special Appeals. Judges Raker and Cathell have authorized me to state that they join in the views expressed herein.